07-0050-cv
Vacold LLC v. Cerami

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2007

(Argued: March 14, 2008                    Decided: October 2, 2008)

Docket No. 07-0050-cv

_____

VACOLD LLC, IMMUNOTHERAPY, INC.,
*Plaintiffs-Appellants*,

-v.-

ANTHONY CERAMI, CARLA CERAMI, VLN LLC
and CERAMI CONSULTING CORPORATION,
*Defendants-Appellees*.

_____

Before:      B.D. PARKER, LIVINGSTON, *Circuit Judges*, and
             HALL, *District Judge*.[*]

Former 50% shareholder of Applied Vaccine Technologies, Inc. sued the other 50% shareholder and its principals for securities fraud after the latter purchased the former's stock, allegedly omitting material facts in connection with the purchase. The United States District Court for the Southern District of New York, Richard M. Berman, J., granted partial summary judgment in favor of the defendants, holding that the omission did not become material until

---

[*] The Honorable Janet C. Hall, District Judge, United States District Court for the District of Connecticut, sitting by designation.

after the parties had entered into an agreement committing them to the purchase and sale, thereby terminating their disclose-or-abstain duty under Rule 10b-5 of the Securities Exchange Act of 1934. The remaining claims were resolved at trial. Plaintiffs appeal the grant of partial summary judgment, and we affirm. Judge Hall dissents in a separate opinion.

FRANKLIN B. VELIE, Sullivan & Worcester LLP, New York, NY (Eric J. Grannis, Law Offices of Eric J. Grannis, New York, NY, *on the brief*), *for Plaintiffs-Appellants*.

MARK J. HYLAND (Jeffrey M. Dine, Ellen E. Lafferty, *on the brief*), Seward & Kissel LLP, New York, NY, *for Defendants-Appellees*.

LIVINGSTON, *Circuit Judge*:

Immunotherapy, Inc. and its successor in interest, Vacold LLC (together, "Immunotherapy"), appeal from a judgment of the United States District Court for the Southern District of New York (Richard M. Berman, J.) in favor of Immunotherapy's former business partner, Cerami Consulting Corporation ("CCC") and its affiliates, Anthony Cerami, Carla Cerami, and VLN LLC ("VLN"), on claims of securities fraud and related state law causes of action. Because we conclude that the parties' agreement of April 9, 1999, constituted a definitive agreement to buy and sell the stock described in that agreement, the defendants were under no duty of disclosure after that date. *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890-91 (2d Cir. 1972). We therefore

2

affirm.

## BACKGROUND

In November 1997, CCC and Immunotherapy agreed to collaborate on three biomedical research projects. One of the projects was the development of a virtual lymph node — "a tiny tubular capsule . . . inserted under a patient's skin in order to trigger certain reactions in the patient's immune system." *Vacold LLC v. Cerami*, No. 00 Civ. 4024 (AGS), 2001 WL 167704, at *1 n.1 (S.D.N.Y. Feb. 16. 2001). Their efforts proved fruitful. By October 1998, officers of CCC and Immunotherapy had filed a patent application relating to virtual lymph node technology, and CCC and Immunotherapy had formed a new entity, later renamed Applied Vaccine Technologies, Inc. ("AVT"), to commercialize their developments. CCC and Immunotherapy each received 50% of AVT's 100,000 shares of stock. Mr. Cerami and Immunotherapy's Chief Executive Officer, C. Leonard Gordon, became co-chief executives of AVT, and Ms. Cerami became a vice president of AVT.

Immunotherapy was a thinly capitalized startup that did not have enough cash to survive as a going concern much past the end of 1998. While AVT was trying to obtain financing or a development partner so it could independently fund its operations and bring its product to market, Immunotherapy began to

think about how to wind up its operations and distribute its assets, including its 50,000 shares of AVT.

On October 16, 1998 — only eight days after AVT was capitalized — Gordon wrote to Mr. Cerami that Immunotherapy was running out of money and intended to liquidate by the end of 1998, inviting a discussion about how AVT might assist Immunotherapy in its windup. Apparently dissatisfied with their relationship, CCC did not wish to pursue joint development of the virtual lymph node with Immunotherapy. Discussions between Immunotherapy and CCC over the following two months therefore centered around the structure of what Ms. Cerami referred to as the "divorce settlement" between Immunotherapy and CCC. They discussed three "settlement" possibilities: (1) Immunotherapy might purchase CCC's AVT stock; (2) CCC might purchase Immunotherapy's AVT stock; and (3) some third party might acquire AVT. After the new year, they began to pursue the second of these options in earnest.

On January 19, 1999, CCC sent to David Dove, Immunotherapy's Chief Operating Officer, a two-page letter labeled a "confidential summary of discussions." According to the letter, the parties contemplated that, by April 16, 1999, a not-yet-in-existence subsidiary of CCC — referred to in the parties' correspondence as NewCo, which ultimately became defendant VLN — would purchase Immunotherapy's AVT stock for $1 million plus an ongoing royalty based on the

proceeds from sales of virtual lymph node products and license fees derived from the virtual lymph node technology. The proposal was expressly conditioned upon CCC's obtaining financing at terms acceptable to CCC. Additionally, the parties stated their expectation that they would prepare, negotiate, and execute a definitive purchase agreement reflecting the above terms and also containing "customary" representations, warranties, conditions, and covenants. The letter concluded with the following statement, printed in boldfaced text:

> The understandings contained herein do not constitute a binding agreement among the parties hereto but merely express a confidential summary of the current discussions with respect to the Transaction, and the understandings contained herein shall only become binding when definitive agreements are executed.

Over the next few weeks, CCC, Immunotherapy, and their attorneys exchanged less-than-cordial letters regarding the January 19 proposal. Immunotherapy objected principally to the financing condition, which, in its view, gave CCC too much optionality in that its obligation to purchase was conditioned on its ability to obtain financing that it deemed suitable, with no consequences to flow from its failure to go forward. A new draft of the divorce settlement, which emerged on February 3, attempted to address this concern. This draft, a three-page letter described as setting forth "on a confidential basis . . . the terms which [CCC] and [Immunotherapy] ha[d] been discussing," provided for the same purchase price of $1 million plus ongoing royalties. It

5

added a minimum annual royalty of $50,000. It also stated that if CCC were unable to obtain financing for the purchase price by May 1, the parties "agree[d] to divide each area of use of the [virtual lymph node] technology between them in a fair and equitable manner." The letter concluded with the same boldface disclaimer of the letter's nonbinding nature as appeared in the January 19 draft. Finally, the letter bore a signature block in which Immunotherapy could — but did not — indicate its acceptance and agreement.

The parties again exchanged comments, this time more congenially, principally regarding the minimum royalty obligation and the division of the virtual lymph node technology should CCC be unable to obtain financing. In particular, Dove asked for greater specificity in the procedure by which CCC and Immunotherapy would divide the use of the technology should CCC fail to purchase Immunotherapy's AVT stock. Dove's letter insisted that the division of the technology "be decided upon now as part of this agreement," "become effective upon expiration" of CCC's deadline for obtaining financing, and "be binding as to [CCC's] making efforts to finance, and as to . . . the plan [for dividing the technology] if [CCC] fails to purchase [the] AVT interests."

A more elaborate draft followed on March 16. This one, four pages in length and again styled a "confidential summary of discussions," set forth a mechanism through which CCC and Immunotherapy would divide the market

6

if CCC could not finance its purchase: with Immunotherapy picking first, the parties would alternate choosing from eight enumerated market segments until each claimed three, and each party would agree not to compete in the other's three segments but could enter any other segment. This draft also altered the date by which CCC had to obtain financing, specifying that if CCC were unable to obtain financing for the purchase price by April 1 — a deadline that would be extended to May 1 if an investor promised CCC by April 1 that it would provide financing — "then the parties . . . agree[d] to divide each area of use as provided in th[e] letter." The draft did not contain the boldfaced disclaimer language that the previous drafts contained, but like the February 3 draft, it bore a signature block that was left unsigned.

The negotiations began to pick up speed. CCC and Immunotherapy exchanged fourth and fifth drafts — each after only brief comments — on March 22 and March 31, respectively. Each was again labeled a "confidential summary of discussions," each again bore a signature block, and as before, Immunotherapy did not sign either one. These drafts also made clear that the arrangement by which CCC and Immunotherapy would divide the market for the virtual lymph node would not be triggered if the parties' failure to consummate the transaction was occasioned by Immunotherapy's "refusal to comply with the provisions" of the agreement. After the fifth draft, Dove sent back what he referred to as "only

7

a few minor changes," including an instruction to change the opening paragraph of the letter so that it was styled a "letter agreement" rather than a "summary of discussions." On April 9, CCC sent back a new draft, which had grown to six pages, that included this change. Gordon signed this letter agreement, which we reprint as an appendix to this opinion, on behalf of Immunotherapy. He dated it April 9, and he sent two copies to CCC's attorney with a request that he have both copies fully executed.

Paragraph 3 of the April 9 agreement stated, in accord with the previous drafts, that the transaction was expressly conditioned upon CCC's obtaining financing. It expressly forbade CCC from securing this financing from Coulter Pharmaceutical Corporation, with which Immunotherapy had prior dealings. Aside from this prohibition, however, the agreement imposed no restriction on the potential sources to which CCC might turn for financing, nor did it require that CCC identify the nature or source of any financing it secured.

Paragraph 4 of the April 9 agreement stated, as had all the previous drafts, that CCC and Immunotherapy planned to prepare, negotiate, and execute, "in connection with the acquisition of the shares," a "standard" stock purchase agreement containing various representations, warranties, and closing conditions, and obtain two related legal opinions. These documents were prepared between April 9 and June 1. The parties executed the stock purchase

8

agreement, exactly as contemplated by paragraph 4 of the April 9 agreement, on June 1 — the day the stock transfer occurred. In the stock purchase agreement, Immunotherapy made the following representations, all of which were qualified by its knowledge, with respect to AVT: (1) its AVT shares were validly issued and free of encumbrances; (2) AVT had no outstanding equity interests other than its 100,000 shares of stock; (3) AVT did not have undisclosed liabilities that would have a material adverse effect, as defined in the agreement; (4) AVT had not suffered a material adverse effect; (5) AVT's business was not being conducted in violation of law to any material extent; and (6) AVT had clear title to its patent application and was not infringing or allegedly infringing any third-party proprietary rights. For its part, CCC represented to Immunotherapy that, to its knowledge, AVT did not have any undisclosed liabilities that would have a material adverse effect and had not otherwise suffered a material adverse effect. CCC made no other representations with respect to AVT.[1]

Paragraph 5 of the April 9 agreement further provided that a document

---

[1] The June 1 agreement thus did not include a so-called "full disclosure representation" or "10b-5 representation," according to which the parties represented to each other — on pain of post-closing indemnification for breach — that neither of them had made any misstatement or omission of material fact in connection with the stock purchase, with respect to AVT's business, or otherwise. Also absent was the obverse, a so-called "nonreliance clause," according to which the parties disclaimed reliance on any information not explicitly represented in or incorporated into the purchase agreement. *See generally* Mark Betzen & Richard Meamber, *Rule 10b-5 and Related Considerations in Acquisition Agreements*, Metropolitan Corp. Couns., Aug. 2004, at 10, *available at* http://www.metrocorpcounsel.com/pdf/2004/August/10.pdf (discussing 10b-5 representations, nonreliance clauses, and other aspects of the interplay between acquisition agreements and Rule 10b-5).

would be "prepared, negotiated and executed" at closing, specifying arrangements for the transfer of technology between Immunotherapy and NewCo, the not-yet-in-existence CCC subsidiary that came to be known as VLN. This closing document was to contain specific provisions requiring, in substance, that Immunotherapy transfer the virtual lymph node technology to NewCo, Immunotherapy's principal employees consult for NewCo, and NewCo and Immunotherapy keep each other's proprietary information in confidence and not solicit each other's employees. In exchange, NewCo was to pay the agreed-upon royalty to Immunotherapy: 1.5% of the net sales of all virtual lymph node products plus 8.5% of the net proceeds of any license, joint venture, or similar arrangement concerning the virtual lymph node, subject to a minimum annual royalty of $50,000 for ten years. On June 1, the parties executed this agreement — again, exactly as contemplated in the April 9 agreement.

This dispute began the year following the purchase and sale of the AVT stock. Pursuant to the arrangement the parties had made for ongoing royalty payments, Immunotherapy had the right to inspect VLN's records to ensure that VLN complied with its obligation to pay royalties. Immunotherapy exercised its inspection right in early 2000 and did not like what it found. It learned that on June 1, 1999, AVT had entered into a development, licensing, and financing agreement with a subsidiary of leading pharmaceutical company Johnson &

Johnson. Pursuant to this agreement, VLN and AVT immediately received $3 million in fees, $1 million of which was used to fund CCC's purchase of Immunotherapy's AVT stock. The agreement also provided that VLN and AVT would receive $2 million in research funding over the following two years, up to $13 million in payments for achieving certain product development milestones, and the potential for large royalties based upon the future sales of virtual lymph node products.

Perhaps regretting that it had sold its stock for only $1 million, Immuno-therapy sued CCC, VLN, and the Ceramis in the United States District Court for the Southern District of New York for securities fraud. The gravamen of Immunotherapy's claim was that the defendants violated section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by purchasing AVT stock from Immunotherapy on June 1 without disclosing the deal with Johnson & Johnson's subsidiary. Immunotherapy also alleged that essentially the same conduct gave rise to liability on theories of common law fraud, negligent misrepresentation, breach of fiduciary duty, unjust enrichment, prima facie tort, and controlling person liability under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

In its initial pleading, Immunotherapy expressly affirmed that the parties

11

"reached an agreement, memorialized in a letter dated April 9, 1999," that a subsidiary of CCC would acquire Immunotherapy's AVT stock for "$1 million plus ongoing royalties of 1.5% on the sale of Virtual Lymph Node products and 8.5% of net proceeds from any licensee, sublicensee or joint venture for the Virtual Lymph Node Technology." (Compl. ¶ 23.) The late Judge Schwartz, who presided over the case until his death in 2003, granted the defendants' motion to dismiss without prejudice, holding that the April 9 letter agreement bound the parties to purchase and sell the AVT stock, thereby precluding a Rule 10b-5 claim based on a failure to disclose material information allegedly occurring after April 9. *Vacold LLC v. Cerami*, No. 00 Civ. 4024 (AGS), 2002 WL 193157 (S.D.N.Y. Feb. 7, 2002); *see also Vacold LLC v. Cerami*, No. 00 Civ. 4024 (AGS), 2002 WL 442240 (S.D.N.Y. Mar. 5, 2002) (amending the order of dismissal).

Immunotherapy then amended its complaint to allege violations of section 10(b) and Rule 10b-5 in connection with both the April 9 letter agreement and the June 1 stock purchase agreement. First, it alleged that the defendants omitted a material fact in connection with their purchase on April 9 by failing to disclose the substance and progress of their negotiations with Johnson & Johnson occurring before April 9. Second, it alleged for the first time that the April 9 agreement did *not* bind the parties to purchase and sell the stock, so that the defendants were obliged to disclose material facts arising thereafter. The

amended complaint alleged that the defendants omitted a material fact in connection with their purchase, which closed on or after June 1, by failing to disclose the deal with Johnson & Johnson's subsidiary, as well as all other material facts concerning the Johnson & Johnson deal arising before the purchase closed.

The parties cross-moved for summary judgment. Judge Berman, to whom the case had by then been transferred, granted summary judgment to the defendants on the claims alleging securities fraud in connection with the June 1 stock purchase agreement. Specifically, he concluded that Judge Schwartz's prior order, which was binding in accordance with the law-of-the-case doctrine, had decided that because the April 9 agreement bound the parties to purchase and sell the AVT stock, the defendants were liable either in connection with the April 9 agreement or not at all. With respect to the April 9 agreement, however, he found a triable issue, namely, whether the defendants' failure to disclose the state of negotiations with Johnson & Johnson prior to April 9, when the parties entered into the agreement, was a material omission. The parties tried the surviving claims before a jury, which found for the defendants. Immunotherapy now appeals, seeking reversal of the district court's decision that the April 9 letter agreement was a binding preliminary agreement that obligated the parties to purchase and sell the AVT stock.

**DISCUSSION**

We review a grant of summary judgment de novo, construing the evidence in the light most favorable to the nonmovant and drawing all reasonable factual inferences in the nonmovant's favor. Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005).

Section 10(b) of the Exchange Act makes unlawful the "use or employ[ment], in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate." 15 U.S.C. § 78j(b). Rule 10b-5, which implements section 10(b), provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit

14

upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To prevail in a Rule 10b-5 action based on subsection (b), a plaintiff must prove that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999) (alteration in original) (quoting *ZVI Trading Corp. Employees' Money Purchase Pension Plan & Trust v. Ross (In re Time Warner Inc. Sec. Litig.)*, 9 F.3d 259, 264 (2d Cir. 1993)).

However, one who buys securities is not required to disclose material information "merely because a reasonable [seller] would very much like to know [it]." *ZVI Trading*, 9 F.3d at 267. "Rather, an omission is actionable under the securities laws only when the [buyer] is subject to a duty to disclose the omitted facts." *Id.* This duty is known as the disclose-or-abstain duty because it refers to the rule that "one with a fiduciary or similar duty to hold material nonpublic information in confidence must either 'disclose or abstain' with regard to trading." *United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993) (citing *Chiarella v. United States*, 445 U.S. 222, 227 (1980)); *see also SEC v. Tex. Gulf*

*Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (en banc) ("[A]nyone in possession of material inside information must either disclose it . . . , or, if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in . . . the securities concerned while such inside information remains undisclosed."). The issue raised in this appeal is whether the Ceramis were subject to the disclose-or-abstain duty with respect to events that transpired between April 9, 1999, and June 1, 1999.

When an investor in a publicly traded stock places an order to buy or sell stock, the trade is generally executed within moments, leaving no lapse of time between the parties' commitment and the transaction's execution. *See, e.g.*, *Radiation Dynamics*, 464 F.2d at 890. But when the parties promise to execute a transaction long before they actually execute it, the question arises: for purposes of Rule 10b-5, did the "purchase or sale" occur when the parties *committed* to execute the transaction, or did it occur when one party *tendered* its securities and the other its money? In *Radiation Dynamics*, we determined that the answer is the former. The "'purchase or sale' of securities within the meaning of Rule 10b-5 is to be determined as the time when the parties to the transaction are committed to one another," even if the exchange of money and shares happens at a later time. *Id*. at 891. This rule holds even if the later exchange of money and securities is contingent upon the occurrence of future

16

events, such as the satisfaction of a financing condition, at least when the contingency is not so unlikely that it renders the stock transaction extremely speculative. *See Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 559 & n.4 (2d Cir. 1985).

Thus, if the April 9 agreement bound the parties to purchase and sell the AVT stock, then the Ceramis cannot be liable under Rule 10b-5 for having failed to disclose material information on June 1 because they had no disclose-or-abstain duty after April 9 — regardless of whether the ultimate closing of the transaction was subject to a future contingency. If the parties did not become committed to one another until June, however, then CCC and the Ceramis can potentially be held liable on the basis of their failure to disclose material facts that they knew on June 1. Therefore, the dispositive question, to which we now turn, is whether the April 9 agreement created a binding obligation.

## I. Preliminary Matters

### A. Waiver

The Ceramis argue that the following release clause in the June 1 stock purchase agreement bars Immunotherapy from asserting its Rule 10b-5 claim:

> Subject to the occurrence of the Closing, [Immunotherapy] hereby waives and discharges any claims it may have against [AVT] or against [CCC or VLN] as of the Closing Date, other than those arising pursuant to

> this Agreement or the [technology transfer agreement] or pursuant to any document contemplated by this Agreement to be delivered by [AVT, CCC, or VLN].

We disagree. In at least some contexts, we have given effect to nonreliance clauses that limit the scope of the representations or omissions that can form the basis for a Rule 10b-5 claim. But we do not give effect to contractual language, such as the language here, purporting to be a general waiver or release of Rule 10b-5 liability altogether. *See* Exchange Act § 29(a), 15 U.S.C. § 78cc(a) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."); *Harsco Corp. v. Segui*, 91 F.3d 337, 343-44 (2d Cir. 1996); *Citibank, N.A. v. Itochu Int'l Inc.*, No. 01 Civ. 6007 (GBD), 2003 WL 1797847, at *2-3 (S.D.N.Y. Apr. 4, 2003). Accordingly, Immunotherapy has not waived its claim.

### B. Law Applicable to Contract Interpretation

The April 9 agreement lacks a choice-of-law clause. The district court assumed, without objection from the parties, that New York law governed the agreement's interpretation. We do the same. *See Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999) (finding the choice-of-law issue waived when the defendant "fail[ed] to bring to the attention of the district court the potential applicability of [another jurisdiction's] law"); *cf. Schiavone v. Pearce*,

18

79 F.3d 248, 252 (2d Cir. 1996) ("A purchase agreement entered into in New York, with closing contemplated in New York, is to be interpreted under New York law.").

### C. *Appropriateness of Summary Judgment*

We next turn to the question whether this case presents genuine issues of material fact that would render summary judgment improper. Immunotherapy argues that the April 9 agreement is susceptible of multiple interpretations and that a jury should decide which interpretation the parties intended. We disagree.

Under New York law, whether a binding agreement exists is a legal issue, not a factual one. *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996); *Ronan Assocs., Inc. v. Local 94-94A-94B, Int'l Union of Operating Eng'rs*, 24 F.3d 447, 449 (2d Cir. 1994). This case does not present disputes about whether particular communications were sent, whether particular words were uttered, or whether the parties entered into prior oral agreements. None of the facts is disputed, and nothing remains for a jury to resolve. The dispute, instead, is about the legal significance of those facts.

Immunotherapy cites *Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1 (1st Cir. 1994), for the proposition that "so long as the evidence does not point unerringly in a single direction but is capable of supporting conflicting

19

inferences, the question of whether a contract has been formed . . . is a question of fact." *Id.* at 7. Although this proposition is true, it is subject to a qualification. Specifically, "where 'the evidentiary foundation for determining the formation of the parties' contract [is] either undisputed or consist[s] of writings,' contract formation is . . . a question of law." *TLT Constr. Corp. v. RI, Inc.*, 484 F.3d 130, 135 (1st Cir. 2007) (alterations in original) (quoting *Lambert v. Kysar*, 983 F.2d 1110, 1114 n.4 (1st Cir. 1993)). Here, of course, the evidentiary foundation consists entirely of writings. The exception that *TLT Construction* describes is on all fours with the present case. Summary judgment is therefore appropriate. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989) ("Where 'a question of intention is determinable by written agreements, the question is one of the law, appropriately decided . . . on a motion for summary judgment.'" (omission in original) (quoting *Mallad Constr. Corp. v. County Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 291, 298 N.E.2d 96, 100, 344 N.Y.S.2d 925, 930 (1973))); *cf. TLT Constr.*, 484 F.3d at 135-36 ("[W]ith faxes, phone discussions, and multiple draft contracts going back and forth over nearly eight months, it is worth taking a step back to recall that '[t]here is no surer way to find out what parties meant, than to see what they have done.'" (second alteration in original) (quoting *Pittsfield & N. Adams R.R. Corp. v. Boston & Albany R.R. Co.*, 260 Mass. 390, 398, 157 N.E. 611, 614 (1927))).

## II.  The April 9 Agreement

By its plain terms, the April 9 agreement contemplates the preparation and execution of additional documentation, namely, a stock purchase agreement and a technology transfer agreement.  The April 9 agreement therefore belongs to a class of agreements known as "preliminary agreements, which . . . provide for the execution of more formal agreements." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998).  Under New York law, "[o]rdinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Id.* at 548; *see also Shann*, 84 F.3d at 77 ("Ordinarily, preliminary manifestations of assent that require further negotiation and further contracts do not create binding obligations.").  "In some circumstances, however, preliminary agreements can create binding obligations." *Adjustrite*, 145 F.3d at 548; *see also Shann*, 84 F.3d at 77 ("[I]f a preliminary agreement clearly manifests such intention, it can create binding obligations.").  The questions for us, then, are: (1) whether the April 9 agreement created binding obligations; and (2) if so, whether those obligations included a commitment to buy and sell the AVT stock, thereby terminating CCC's disclose-or-abstain duty on April 9.  We conclude, for the reasons set forth below, that the answer to both questions is "yes."

21

## A. *Was the April 9 Agreement Legally Binding?*

"[B]inding preliminary agreements fall into one of two categories." *Adjustrite*, 145 F.3d at 548. Agreements within the first category are type I preliminary agreements — "fully binding preliminary agreement[s], which [are] created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." *Id.*; *see also Shann*, 84 F.3d at 77 ("Type I is where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities."). Agreements of this type render the parties "fully bound to carry out the terms of the agreement even if the formal instrument is never executed." *Adjustrite*, 145 F.3d at 548. Agreements within the second category are type II preliminary agreements — "'binding preliminary commitment[s]'" that are "binding only to a certain degree" because "the parties agree on certain major terms, but leave other terms open for further negotiation." *Id.*; *see also Shann*, 84 F.3d at 77 ("Type II is where the parties recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open."). These agreements "do[] not commit the parties to their ultimate contractual objective." *Adjustrite*, 145 F.3d at 548 (quoting *Teachers*

22

*Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (Leval, J.)) (internal quotation mark omitted). Rather, they bind the parties "to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework." *Id.* (quoting *Tribune*, 670 F. Supp. at 498) (internal quotation mark omitted). If the parties "fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation." *Id.*

The April 9 agreement bound the parties to purchase and sell the AVT stock, thus obviating any duty of disclosure on the part of CCC after April 9, if it constituted a type I agreement, but not if it constituted a type II arrangement or was, in the alternative, not binding in any respect. We have identified four factors to analyze when considering whether an agreement is a type I preliminary agreement, and five factors to analyze when considering whether an agreement is a type II preliminary agreement.[2] Some of the factors from the two sets are neither relevant nor helpful in the present context. For example, one

---

[2] When considering whether an agreement is a type I preliminary agreement, we analyze: (i) "whether there is an expressed reservation of the right not to be bound in the absence of a writing"; (ii) "whether there has been partial performance of the contract"; (iii) "whether all of the terms of the alleged contract have been agreed upon"; and (iv) "whether the agreement at issue is the type of contract that is usually committed to writing." *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005). And when considering whether an agreement is a type II preliminary agreement, we analyze: (i) "whether the intent to be bound is revealed by the language of the agreement"; (ii) "the context of the negotiations"; (iii) "the existence of open terms"; (iv) "partial performance"; and (v) "the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Id.* at 157.

factor common to both sets — whether the parties have *partially* performed the agreement, evidencing after the fact their intention to be bound at the time of the alleged agreement — needs no extended discussion here because the record clearly shows that both parties *fully* executed their obligations under the April 9 agreement. Similarly, whether the agreement is of the type usually reduced to writing, another factor common to both sets, does not aid our analysis because we cannot discern what is usual in this context. Although a "million-dollar acquisition" involving the purchase of business assets "ordinarily would be committed . . . to a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts," *Adjustrite*, 145 F.3d at 551, this case does not involve the ordinary situation in which an outside investor acquires stock in, or acquires the business of, another entity. Rather, the Ceramis, who were already insiders and affiliates of AVT, acquired the stock of AVT that they did not already own from Immunotherapy, another affiliate, which retained no continuing ownership interest. In this context, and based on the record before us, this factor is of little help.

As for the other factors, some duplicate or overlap with each other, and we therefore address both type I and type II agreements in the same discussion. In doing so, we remain mindful that these factors help us identify categories of facts

24

that are often useful in resolving disputes of this sort, but they do not provide us with a talismanic scorecard. The ultimate issue, as always, "is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." *Id.* at 548-49.

### 1. The Language of the Agreement

We begin, as we usually do, with the language of the agreement. In particular, we ask whether the agreement expressly states that the parties will not be bound in the absence of a further, definitive written instrument. *See Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005); *Adjustrite*, 145 F.3d at 549. We find no such reservation here. The April 9 agreement is six pages long and titled a "letter agreement." It is not a proposal, a draft, an expression of desires, or a memorandum of understanding. *Cf. Brown*, 420 F.3d at 154 (two-page "memorandum of understanding" held not to be a type I preliminary agreement); *Adjustrite*, 145 F.3d at 549 (two-page "proposal" that stated "desires" held nonbinding); *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 81 (2d Cir. 1985) ("proposed agreement" held nonbinding). Neither did the April 9 agreement speak in "decidedly non-committal" language "suggesting, at most, a promise to 'work together.'" *Brown*, 420 F.3d at 154. Rather, it specified, in considerable detail, the performance that it required of each party. Just as importantly, it specified in equal detail what would become of the virtual lymph node technology

25

if CCC were unable to obtain financing by May 1, and thus unable to purchase Immunotherapy's stock on June 1.

Immunotherapy asks us to place great weight on the fact that the agreement reads, "[s]ubject to the terms and conditions hereof, it is presently contemplated that [CCC] would purchase the 50,000 shares . . . for an aggregate purchase price of $1,000,000," rather than, for example, "it is agreed" that CCC would do so, subject to financing. In Immunotherapy's view, the words "presently contemplated" clearly manifest the parties' intent not to be bound. We disagree. To be sure, "a manifestation of intention that a promise shall not affect legal relations may prevent the formation of a contract." Restatement (Second) of Contracts § 21 (1981). The phrase "presently contemplate," however, is not such a manifestation. *Cf. id.* § 21 cmt. b, illus. 3-4 (statements that an instrument "'constitutes no contract,'" "'confers no legal right,'" or "is not to be a legal agreement or subject to legal jurisdiction in the law courts" negate binding obligations). Every contract that calls for future performance contemplates that performance, and every such contract speaks of the parties' present intentions at the time they enter into it. In this context, it is clear that "contemplate" means "anticipate doing or performing," "plan on," and "intend" — not "view mentally with continued thoughtfulness" or "muse or ponder about." *Webster's Third New International Dictionary* 491 (2002).

Even a brief survey of publicly available transaction agreements confirms the ubiquitous use of phrases such as "transaction contemplated by this Agreement" in written instruments of sale and acquisition. *See, e.g.*, Millennium Pharms., Inc., Current Report (Form 8-K) ex. 2.1 (Apr. 10, 2008), *available at* http://www.sec.gov/Archives/edgar/data/1002637/000104746908004416/a2184 684zex-2_1.htm ("transactions contemplated by this Agreement," "transactions contemplated hereby," and similar phrases used twenty-two times in Takeda Pharmaceutical's agreement to acquire Millennium Pharmaceuticals); Bear Stearns Cos., Current Report (Form 8-K) ex. 2.1 (Mar. 20, 2008), *available at* http://www.sec.gov/Archives/edgar/data/19617/000089882208000301/mergera greement2.htm (sixty times in JPMorgan Chase's agreement to acquire Bear Stearns); Int'l Paper Co., Current Report (Form 8-K) ex. 10.1 (Mar. 24, 2008), *available at* http://www.sec.gov/Archives/edgar/data/51434/000119312508061570 /dex101.htm (thirty-one times in International Paper's agreement to purchase several businesses from Weyerhaeuser Co.); ChoicePoint Inc., Current Report (Form 8-K) ex. 2.1 (Feb. 22, 2008), *available at* http://www.sec.gov/Archives/edga r/data/1040596/000119312508035585/dex21.htm (sixty-three times in Reed Elsevier Group PLC's agreement to acquire ChoicePoint); Countrywide Fin. Corp., Current Report (Form 8-K) ex. 2.1 (Jan. 17, 2008), *available at* http://www.sec.gov/Archives/edgar/data/25191/000089882208000107/exhibit2

27

1.htm (sixty-eight times in Bank of America's agreement to acquire Country-wide). We have no reason to think here that the parties intended to deviate from this established usage.

We note, in addition, that courts also have had occasion to use the term "contemplate" to describe the future performance called for under a binding contract. For example, the doctrine of anticipatory breach allows a contracting party to sue before performance is due if the other party repudiates its contractual duties. N.Y. U.C.C. § 2-610; *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 462-63, 705 N.E.2d 656, 659, 682 N.Y.S.2d 664, 667 (1998). New York courts have described this doctrine as "applicable to bilateral contracts which *contemplate* some future performance." *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44, 549 N.E.2d 1161, 1164, 550 N.Y.S.2d 590, 593 (1989) (emphasis added); *accord Gardiner Int'l, Inc. v. J.W. Townsend & Assocs., Inc.*, 13 A.D.3d 246, 247, 788 N.Y.S.2d 312, 314 (2004) (emphasis added). If "contemplate" were a magic word that signaled the lack of a binding obligation, then a party could not invoke the doctrine of anticipatory breach on the basis of contemplated performance. One cannot sue based on a repudiation of performance that is not, in fact, required.

Our conclusion draws considerable support from the April 9 agreement's drafting history, which we are both permitted and required to consider. *See*

*Winston*, 777 F.2d at 80-81 (in "determin[ing] whether the parties intended to be bound," we consider "'correspondence [and] other preliminary or partially complete writings'" (quoting Restatement (Second) of Contracts § 27 cmt. c)); *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399-400, 361 N.E.2d 999, 1001, 393 N.Y.S.2d 350, 351-52 (1977); *Morgan Servs., Inc. v. Abrams*, 21 A.D.3d 1284, 1285, 801 N.Y.S.2d 457, 457-58 (2005). The April 9 agreement was styled a "letter agreement," whereas all five previous drafts were styled a "summary of discussions" or the like. The April 9 agreement was signed by Immunotherapy's chairman, whereas all five previous drafts were not. The April 9 agreement was not followed by any further back-and-forth, whereas all five previous drafts were soon followed by further negotiations. Moreover, the early drafts expressly and conspicuously stated that they were not intended to be binding, but this language is absent from the April 9 agreement. Immuno-therapy asks us to consider the "presently contemplated" language in a vacuum, but this is not how we are to view it. Rather, we look at this language and the April 9 agreement as a whole, in light of the totality of the circumstances, which includes the five prior drafts. *See Brown Bros.*, 41 N.Y.2d at 399-400, 361 N.E.2d at 1001, 393 N.Y.S.2d at 352 ("In determining whether the parties entered into a contractual agreement . . . disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of

29

all of these, given the attendant circumstances . . . .").  Considering all this, we find it inescapable that the parties meant for the April 9 agreement to be not a summary of discussions, but a binding expression of their intent with regard to the transfer of Immunotherapy's AVT stock.

## 2.  Context of the Negotiations

The second factor here, the context of the negotiations, is helpful in distinguishing type II agreements from the fully binding commitments that constitute type I arrangements.  An agreement is likely to be a type II preliminary agreement, and not a fully binding type I preliminary agreement, when it is "subject to numerous contingencies that ha[ve] the potential to dramatically affect planning, execution, and management" of the ultimate contractual objective.  *Brown*, 420 F.3d at 158; *see also Tribune*, 670 F. Supp. at 500-01. Parties enter into type II agreements — committing themselves to good-faith efforts to reach agreement on the remaining terms, but not to the ultimate objective — when they seek to "preserv[e] flexibility in the face of future uncertainty" rather than establish "determinative methodologies" that will apply to future contingencies.  *Brown*, 420 F.3d at 158.

Here, this factor favors the conclusion that the April 9 agreement was of the type I variety — a definite agreement to buy and sell the AVT stock, subject to CCC's ability to secure financing.  The parties foresaw that their transaction

30

had the potential to be affected by a future contingency, namely, CCC's failure to obtain the needed financing. They chose to establish a determinate framework, rather than a flexible one, to address that contingency. The April 9 agreement thus expressly provided that Immunotherapy and CCC would divide the market for the virtual lymph node technology if CCC was unable to purchase Immunotherapy's AVT stock. Immunotherapy, moreover, was the party that strongly desired that the provisions related to the division of the technology "be binding as to [CCC's] making efforts to finance, and as to . . . the plan [for dividing the technology] if [CCC] fails to purchase [the] AVT interests." Indeed, the parties' correspondence indicates that Immunotherapy, anxious to wind up its affairs, adamantly insisted that the technology-splitting arrangement have legal force upon expiration of CCC's deadline for obtaining financing, and before the June 1 closing date. The context of the negotiations thus strongly suggests that the parties sought determinateness and certainty in the April 9 agreement, not flexibility and optionality subject to the parties' good-faith efforts to reach agreement as to open issues.

### 3. Open Terms

The existence of open terms "is always a factor tending against the conclusion that the parties have reached a binding agreement," *Tribune*, 670 F. Supp. at 499, and indeed, there is a "'strong presumption against finding binding

31

obligation[s]'" in an agreement that "'include[s] open terms . . . and expressly anticipate[s] future preparation and execution of contract documents,'" *Arcadian*, 884 F.2d at 73 (quoting *Tribune*, 670 F. Supp. at 499). At the same time, the parties' intent is ultimately controlling: if the parties intended to be bound despite the presence of open terms, "courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations," *Tribune*, 670 F. Supp. at 499, provided that the agreement is not so "fragmentary" as to be "incapable of sustaining binding legal obligation," *id*. at 497.

If a preliminary agreement contains "no issues outstanding that were perceived by the parties as requiring negotiation, their agreement should be seen as a[] Type I binding obligation," *Shann*, 84 F.3d at 82, notwithstanding that the parties may intend to memorialize their understanding in more formal documents, *Adjustrite*, 145 F.3d at 548. But if, in contrast, the parties enter into a preliminary agreement perceiving that open issues remain to be worked out and intending simply to bind themselves to good-faith efforts at further negotiation, then the preliminary agreement, if an agreement at all, is a type II obligation. *Id*.

Here, nothing in the record reveals that the parties left anything for further negotiation, nor does the record show that the parties in fact negotiated

anything between April 9 and June 1.  In its Local Civil Rule 56.1 statement of disputed facts opposing the Ceramis' motion for summary judgment, Immunotherapy pointed to paragraphs 4 and 5 of the April 9 agreement in contending that it "contained full paragraphs setting forth open terms that had to be negotiated to both parties' satisfaction, including no fewer than twelve contractual elements to be negotiated." The record, however, belies the assertion that anything had to be negotiated regarding these elements.  To the contrary, the April 9 agreement referred to the undrafted stock purchase agreement, as well as the representations and warranties to be contained therein, as "standard."  And paragraph 5 of the April 9 agreement specifically set forth the substance of the provisions to be included in the technology transfer document to be executed at closing.

The April 9 agreement itself thus strongly suggests that "[a]lthough the parties recognized that the final contract would include additional 'boilerplate,' they foresaw no disputes relating to the boilerplate." *Shann*, 84 F.3d at 77.  In such a circumstance, the task of formalizing contract documentation does not negate the finding of a type I agreement, so long as the parties "viewed their contract as . . . a binding Type I agreement . . . in which everything had been agreed and all that remained was the need for lawyers' embellishments." *Id.* at 77-78.

We see nothing in the record to undercut the conclusion that CCC and Immunotherapy so viewed the April 9 agreement. Although the record is replete with drafts, markups, and comments to the document that eventually became the April 9 agreement, it is wholly silent regarding the parties' interactions after April 9. Immunotherapy has failed to point to evidence that, for example, the parties had ongoing negotiations after April 9 and hence more remained to be done besides adding lawyers' embellishments. We therefore see no evidence from which we could conclude that the parties left material terms of their agreement open to further negotiation. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (when the burden of proof falls on the nonmoving party, summary judgment is appropriate if there is insufficient evidence to support an element of the claim).

### *B. Did the April 9 Agreement Bind CCC To Buy, and Immunotherapy To Sell, the AVT Stock?*

Immunotherapy argues that even if the April 9 agreement was binding in some respects, it did not bind the parties to purchase and sell the stock, thus taking the case outside the holding of *Radiation Dynamics* that Rule 10b-5 disclosure duties are extinguished when there is a firm commitment to such an exchange. Immunotherapy points to paragraph 7 of the agreement, which provides in relevant part that "[CCC] and Immuno[therapy] agree to split the use of the Virtual Lymph Node technology in humans in the event and *only* in

34

the event [CCC] or its affiliate does not purchase the AVT shares from Immuno[therapy] as provided in this letter, unless such failure to purchase is caused by Immuno[therapy's] refusal to comply with the provisions of this letter." Immunotherapy reads this provision as creating options for both parties. CCC could either tender $1,000,000 or agree to divide the market. Once CCC tendered the money, Immunotherapy could either tender its stock or choose to forgo dividing the market.

Immunotherapy's suggested reading, however, is inconsistent with the language of paragraph 7 itself, which affirms that a decision on Immuno-therapy's part not to tender its shares would have been a "refusal to comply with the provisions of th[e] letter," meaning a breach, not a contractually afforded election to forgo dividing the market. Moreover, Immunotherapy's suggested reading requires us to construe the contract to preclude CCC from compelling Immunotherapy to tender its stock through a specific performance decree. Urging this construction, Immunotherapy invokes the maxim *inclusio unius est exclusio alteris* to argue that paragraph 7 operates as a limitation of remedies that precludes both a decree of specific performance ordering Immunotherapy to tender and an award of damages. We disagree because the *inclusio unius* principle does not operate so broadly in this context.

New York courts routinely award specific performance in cases involving

the conveyance of stock in privately held corporations. *See, e.g.*, *In re Fontana D'Oro Foods*, 65 N.Y.2d 886, 888, 482 N.E.2d 1216, 1217, 493 N.Y.S.2d 300, 301 (1985); *Waddle v. Cabana*, 250 N.Y. 18, 26, 114 N.E. 1054, 1056 (1917); *Haymarket LLC v. D.G. Jewellery of Can. Ltd.*, 290 A.D.2d 318, 319, 736 N.Y.S.2d 356, 358 (2002). They appear willing, at least in some circumstances, to recognize limitations on available remedies, but they do so only when the contract "contains a clause *specifically* setting forth the remedies available to the buyer if the seller is unable to satisfy a stated condition." *101123 LLC v. Solis Realty LLC*, 23 A.D.3d 107, 108, 801 N.Y.S.2d 31, 31-32 (2005) (emphasis added). For example, the court in *101123 LLC* found the following limitation of liability to be sufficiently specific to preclude an award of specific performance absent a willful breach by the seller:

> In the event that Seller [breaches], the sole liability of Seller will be to instruct the Escrow Agent to return to Purchaser the Contract Deposit . . . ; provided, however, that if Seller *wilfully* [breaches], Purchaser shall have the right to bring an action for specific performance against Seller and exercise any other remedies at law or in equity.

*Id.* at 108-09, 801 N.Y.S.2d at 32 (internal quotation marks omitted).

The April 9 agreement, however, contains no language indicating that paragraph 7 — or any other provision — provides CCC's sole or exclusive remedy. Instead, the April 9 agreement is far more closely analogous to the

contract at issue in *Papa Gino's of America, Inc. v. Plaza at Latham Associates*, 135 A.D.2d 74, 524 N.Y.S.2d 536 (1988). The contract at issue there, a commercial lease, contained the following clause: "Landlord shall not lease to any other store premises whose main business is the sale of pizza. . . . If Landlord leases to a store in violation of this paragraph Tenant shall pay a [specified lower amount of rent] . . . ." *Id.* at 76, 542 N.Y.S.2d at 538 (omissions in original) (emphasis omitted). The landlord argued that, as long as it agreed to accept the lower amount of rent, it was free to lease the premises to another pizza shop. The court disagreed, holding that the clause did not prevent the tenant from obtaining specific performance to prevent the landlord from leasing to another pizza shop. As the court held, "[t]he provision in question did not reserve an option for [the landlord's] unilateral election." *Id.* Rather, the lower amount of rent was a liquidated damages provision; because "[t]here was no language in the lease agreement that [the lower amount] of rent was to be [the tenant's] only remedy," the tenant was able to obtain specific performance. *Id.*

Similarly, to the extent that paragraph 7 of the April 9 agreement has any effect at all on the remedies available to either party, it is no more than a provision that would liquidate damages if Immunotherapy refused to tender its shares. It cannot, however, be a limitation of liability that would preclude specific performance or create a unilateral option for Immunotherapy. Although

37

a liquidated damages provision precludes a party from recovering lost profits and other measures of *damages*, *see U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004); *Sure-Trip, Inc. v. Westinghouse Eng'g*, 47 F.3d 526, 534-35 (2d Cir. 1995); *J.R. Stevenson Corp. v. County of Westchester*, 113 A.D.2d 918, 921, 493 N.Y.S.2d 819, 823 (1985); Restatement (Second) of Contracts § 347 cmt. a, it does not prevent a party from seeking specific performance, absent an express provision to this effect. *See Rubinstein v. Rubinstein*, 23 N.Y.2d 293, 298, 244 N.E.2d 49, 52, 296 N.Y.S.2d 354, 358 (1968) ("For there to be a complete bar to equitable relief there must be something more, such as explicit language in the contract that the liquidated damages provision was to be the sole remedy."); *Papa Gino's*, 135 A.D.2d at 76, 524 N.Y.S.2d at 538 ("[A] liquidated damages clause does not bar the equitable relief of specific performance unless there is explicit language that it is to be the sole remedy for a breach." (citations omitted)); Restatement (Second) of Contracts § 361 ("Specific performance . . . may be granted to enforce a duty even though there is a provision for liquidated damages for breach of that duty."). Accordingly, nothing would have prevented CCC from suing for specific performance. It follows that the April 9 agreement bound the parties to purchase and sell the AVT stock, thus placing this case within the ambit of *Radiation Dynamics*.

38

**CONCLUSION**

Securities transactions involving a long delay between the agreement and the tendering of consideration are commonplace. When a party wants to protect itself against unknown or unforeseen risks between the signing and the closing, it should negotiate for contractual guarantees against these risks. Immunotherapy did not do so, and it now seeks solace elsewhere. The securities laws do not provide the sort of relief for seller's remorse that Immunotherapy seeks, however, and we accordingly affirm the judgment of the district court.

J. HALL, *District Judge*, DISSENTING:

There is much in the majority opinion with which I agree. The majority appropriately concludes that we must apply the *Radiation Dynamics* framework to evaluate the securities issues in this case. It correctly recognizes that CCC's liability under Rule 10b-5 turns on whether or not CCC became committed to purchase Immunotherapy's shares in AVT on April 9, 1999, and then decides to apply New York contract law to that question. Finally, the majority properly concludes that, under New York law, the April 9 agreement constituted a "binding" agreement.

Where I part ways with the majority is with respect to its conclusion that the April 9 agreement was a binding Type I agreement, rather than a binding Type II agreement. Because the parties had only a Type II agreement, I respectfully dissent.

I.

To understand why the parties had only a Type II agreement, it is important to review the differences between Type I and Type II agreements. Type I agreements are "fully binding[,] preliminary agreements." Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998). These agreements are created when the parties have agreed on all points requiring

40

negotiation, but have not yet memorialized everything in writing; they agree to do so later in a more formal document. Id. A Type I agreement is preliminary in name only: it is fully enforceable, despite the fact that the parties expect more formalities to occur at a later stage. Id.

By contrast, Type II agreements are binding, but in a different way. These agreements are created "when the parties agree on certain major terms, but leave other terms open for future negotiation." Id. Type II agreements do not actually commit the parties to their contractual objectives, but instead merely commit the parties to complete negotiation of the remaining issues in good faith, and within the confines of their preliminary commitment. Id. Importantly, if a complete contract is not ultimately agreed upon, "the parties may abandon the transaction as long as they have made a good faith effort to close the deal."[4] Id.

It is also possible for an agreement to be a hybrid between a Type I and Type II agreement. Such hybrid contracts are characterized by complete agreement on certain issues, and a lack of agreement on other, independent issues which the parties have agreed to resolve at a later date. Where there is

[4] Of course, sometimes a preliminary "agreement" will fit into neither of these categories. That is, in some cases the manifestation of mutual assent will be so indefinite, and the number of material terms left open will be so large, that the contract is completely unenforceable. Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 95 (2d Cir. 2007).

41

agreement, these contracts are fully enforceable, and where there is not yet full agreement, these contracts impose an obligation to conduct future negotiations in good faith.  See Brown v. Cara, 420 F.3d 148, 156 (2d Cir. 2005).

Although there are important analytical differences between Type I and Type II agreements, policing the boundaries between the two is not always a simple task.  Part of the problem stems from the fact that courts have developed one multi-factor test for identifying Type I agreements, and a second multi-factor test for identifying Type II agreements.  See Brown, 420 F.3d at 154-58.  These tests are helpful for determining when an agreement is not binding at all, because if an agreement fits into neither category, clearly it is a non-binding agreement.  When deciding whether there is a Type I or a Type II agreement, however, the multi-factor tests become difficult to apply because they examine several similar factors.[5]   The key is to identify those factors that help distin

---

[5] To determine if there is a Type I agreement, courts weigh the following factors:

> (1) whether there is an expressed reservation of the right not to be bound in the absence of a writing;
> (2) whether there has been partial performance of the contract;
> (3) whether all of the terms of the alleged contract have been agreed upon; and
> (4) whether the agreement at issue is the type of contract that is usually committed to writing.

Brown, 420 F.3d at 454 (citing Adjustrite, 145 F.3d at 549).  By contrast, to determine if there is a Type II agreement, courts examine:

guish Type I agreements from Type II agreements, rather than those factors that distinguish Type I and Type II agreements from nonbinding agreements.

## II.

There is a "strong presumption" against finding a Type I agreement when the agreement "include[s] open terms, call[s] for future approvals[,] and expressly anticipate[s] future preparation and execution of contract documents." Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989); see also Brown, 420 F.3d at 154. The April 9 agreement easily qualifies for this strong presumption. It explicitly included open terms and explicitly called for future negotiations. The agreement expressly declared that the parties "expect that" various documents "will be prepared, negotiated and executed," including the actual stock purchase agreement that would operate to transfer Immunotherapy's AVT shares.

The majority declines to apply any presumption against Type I agree-

---

(1) whether the intent to be bound is revealed by the language
of the agreement;
(2) the context of the negotiations;
(3) the existence of open terms;
(4) partial performance; and
(5) the necessity of putting the agreement in final form, as
indicated by the customary form of such transactions.

Id. at 157 (citing Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989)).

43

ments because it believes that "nothing in the record reveals that the parties left anything for future negotiation, nor does the record show that the parties in fact negotiated anything between April 9 and June 1." Ante, at 33. However, the agreement expressly declared that the stock purchase agreement was still to be negotiated; coupling that with the fact that the stock purchase agreement was later drafted at the very least creates an inference that future negotiations took place. While the record contains no extrinsic evidence that negotiations actually took place, we must determine whether, at the time the parties entered into the April 9 agreement, they believed that future negotiations would be needed. There is no better indication of that belief than the fact that they actually expressed that belief in their agreement.

The majority nonetheless emphasizes that the terms of the stock purchase agreement were to be "standard." April 9 Agreement at 3. The majority then cites Shann v. Dunk, 84 F.3d 73 (2d Cir. 1996), to argue that a contract will not necessarily become a Type II agreement by virtue of the fact that the parties needed to fill in the gaps with additional boilerplate. See id. at 77-78.

The majority is correct that an agreement will not necessarily become a

44

Type II agreement simply because the parties leave some additional "boilerplate" to be drafted. But Shann also makes clear that the key question is how the parties viewed that boilerplate. If "everything had been agreed and all that remained was the need for lawyers' embellishments," the agreement would be a binding Type I agreement. Id. at 78. If instead the parties had simply agreed on "all the important terms," and had then "agreed to negotiate in good faith over any differences that might arise relating to the undrafted boilerplate," the agreement would be a Type II agreement. Id.

Assuming, arguendo, that the majority has correctly identified the missing terms as "boilerplate," the agreement still expressly stated that this "boilerplate" remained to be negotiated. As a result, it is still appropriate to apply a "strong presumption" against finding a Type I agreement.

III.

Once it is clear that this court must apply a "strong presumption" against finding a Type I agreement, the only question remaining is whether other factors point so compellingly to a Type I agreement, rather than a Type II agreement, that this presumption can be overcome. No such evidence has been presented that would entitle the defendants to summary judgment.

First, the majority rests on the fact that the April 9 agreement contains

45

no language expressly stating that the parties will not be bound by the agreement. From this, the majority concludes that the April 9 agreement was meant to be binding. In the majority's view, that conclusion gets further support from the agreement's drafting history, during which it evolved from a "summary of discussions" into a "letter agreement."

The language of the agreement, and its drafting history, certainly confirm that the parties intended for the agreement to be "binding." But this conclusion does little to address the most important question in the case: what kind of binding agreement did the parties enter into? Indeed, if the parties had intended to enter into a binding Type II agreement, one also would not expect to see language in the contract expressly stating that the parties had no intention to be bound. See Brown, 420 F.3d at 154 ("Where there is no language [in an agreement] that may be read to bind the parties to the ultimate goal, an explicit reservation [of the right not to be bound] would serve no purpose."). Similarly, calling the April 9 agreement an "agreement" is just as consistent with a Type II contract as it is with a Type I contract.

Furthermore, the majority dismisses the language in the agreement stating that the stock purchase was "presently contemplated."[6] The fact that

[6] It should also be noted that the parties referred to the stock purchase as a "potential acquisition," rather than as something more definitive.

46

the parties chose this phrasing, rather than something more definitive, raises further doubts regarding the extent to which the parties intended to be bound by the agreement. Saying that an agreement is "presently contemplated" makes a great deal of sense in a Type II agreement, where the most important terms have been agreed to, but further negotiations are still required. It makes much less sense to use this language in a Type I agreement.[7]

---

[7] The majority also relies on several publicly available transaction agreements to make its case. These agreements were not cited by any of the parties, and they are not part of the record. The majority appears to use them to establish an "industry practice" of the use of the term "contemplated," notwithstanding that these documents were all created roughly nine years after the agreement at issue in this case.

In any event, these transaction documents do not bolster the majority's position. Although they do make use of the term "contemplated," they elsewhere contain definitive statements that make clear the fully binding nature of the transaction. See, e.g., Millennium Pharms., Inc., Agreement and Plan of Merger (Form 8-K) (Apr. 10, 2008) at 1, 4, available at http://www.sec.gov/Archives/edgar/data/1002637/000104746908004416/a2184684zex-2_1.ht m, ("Subject to the terms and conditions set forth in this Agreement . . . Merger Sub shall . . . commence the Offer . . . . The Company hereby approves of and consents to the Offer . . . .") (emphasis added); J.P Morgan Chase & Co., Agreement and Plan of Merger (Form 8-K) (Mar. 20, 2008) at 1, available at http://www.sec.gov/Archives/edgar/data/19617/000089882208000301/mergeragreement2.ht m ("Subject to the terms and conditions of this Agreement . . . Merger Sub shall merge with and into Company") (emphasis added); Int'l Paper Co., Purchase Agreement (Form 8-K) (Mar. 20, 2008) at 1, available at http://www.sec.gov/Archives/edgar/data/51434/000119312508061570/dex101.htm, ("Upon the terms and subject to the conditions of this Agreement . . . Seller shall . . . sell, transfer, assign and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller . . . all of Seller's. . . title and interest in . . . all of the Transferred Assets . . . .") (emphasis added); ChoicePoint Inc., Agreement and Plan of Merger (Form 8-K) (Feb. 22, 2008) at 1, available at http://www.sec.gov/Archives/edgar/data/1040596/000119312508035585/dex21.htm, ("Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time . . . Merger Sub shall be merged with and into the Company . . . .") (emphasis added); Countrywide Fin. Corp., Agreement and Plan of Merger (Form 8-K) (Jan 17, 2008) at 1, available at

47

The majority also relies on the context of the negotiations to support its conclusion that the parties had entered into a Type I agreement. In the majority's view, because the negotiations did not take place under a cloud of uncertainty, that lack of uncertainty is a factor weighing against a finding of a Type II agreement.

When parties negotiate a contract in the face of significant uncertainty, that uncertainty may be one factor that contributes to a finding that there is a Type II agreement. See id. at 158. But there is absolutely nothing in Brown that suggests that the presence of such uncertainty is required, or even common, for Type II agreements. Indeed, the Brown court simply concluded that such conditions were "consistent" with a Type II agreement. Id.

In any event, the majority does not consider the limited extent of the "certainty" that the parties were operating under. It is true enough that the parties created a relatively elaborate "contingency plan" to deal with the possibility that the stock transfer would not be completed. Yet the majority fails to explain why this element of certainty carries particular persuasive

http://www.sec.gov/Archives/edgar/data/25191/000089882208000107/exhibit21.htm, ("Subject to the terms and conditions of this Agreement, . . . Company shall merge with and into Merger Sub.") (emphasis added). Immunotherapy's agreement did not contain any such definitive language requiring that the actual stock purchase "shall" take place.

48

force.[8]  If anything, the presence of the "contingency plan" reveals that the parties were quite unsure about whether or not the stock purchase was actually going to take place – an uncertainty that is quite consistent with a conclusion that the parties had a Type II agreement with regard to the transfer of AVT's stock.[9]

## IV.

There is nothing in the majority's discussion, or in CCC's briefs, that I believe adequately explains why the April 9 agreement is better viewed as a binding Type I agreement, rather than a binding Type II agreement.  My own review also reveals nothing in the April 9 agreement, or in the record, that can overcome the mandatory "strong presumption" against finding a Type I agreement.  Because of this, I conclude that the April 9 agreement was a Type II agreement that did not actually require the parties to consummate the

---

[8] As discussed in Part I, it is possible for parties to create an agreement that constitutes a Type I agreement as to some issues, while consisting only of a Type II agreement as to other issues.  The certainty that the majority has identified may well be a factor supporting a conclusion that the parties had a Type I agreement insofar as they had agreed to divorce, one way or another.  It is not a particularly persuasive factor supporting a conclusion that the parties had a Type I agreement with respect to the stock transfer.

[9] Undoubtedly, this uncertainty stemmed in part from questions about CCC's ability to obtain the necessary financing.  But this uncertainty also could have stemmed from doubts over whether the parties would be able to successfully negotiate the still-outstanding issues.  There is nothing in the contingency plan that excludes the latter scenario as one of the sources of uncertainty.

49

stock transaction.[10]  Instead, the agreement merely required the parties to engage in good faith negotiations concerning a final agreement for CCC to purchase Immunotherapy's shares.[11]  I therefore respectfully dissent.

---

[10] Because I reach this conclusion, I view the majority's discussion of damages versus specific performance to be unnecessary.  If CCC was entitled to specific performance of the agreement, it would only be entitled to force Immunotherapy to do what it had promised, i.e., the most CCC could do would be to force Immunotherapy to engage in good faith negotiations.

[11] Of course, those negotiations would still have been carefully circumscribed by various provisions in the April 9 agreement.  It is not clear whether, as part of these good faith negotiations, Immunotherapy would have been able to obtain any leverage if it had been aware of the Johnson & Johnson deal.  Accordingly, it may well be the case that Immunotherapy's Rule10b-5 claim should fail on the grounds that it suffered no damages from the non-disclosure.  The district court never reached that issue because it thought it was bound by the "law of the case" doctrine.  On appeal, the parties have not discussed that issue in their briefs.  I would therefore vacate the judgment and remand the case to allow the district court to consider that issue in the first instance.

# APPENDIX

CERAMI CONSULTING CORPORATION
765 Old Saw Mill Road
Tarrytown, New York 10591

April 9, 1999

David Dove, MD
Chief Operating Officer
Immunotherapy, Inc.
360 Lexington Avenue
New York, New York 10017

Dear David:

The following is a confidential letter agreement between Cerami Consulting Corporation ("Cerami Consulting") and Immunotherapy, Inc. ("Immuno"), regarding the potential acquisition (the "Transaction") of all right, title and interest in Applied Vaccine Technologies Corp. ("AVT") owned by Immuno and its affiliates.

1. Subject to the terms and conditions hereof, it is presently contemplated that Cerami Consulting would purchase the 50,000 shares of AVT common stock owned by Immuno or its affiliates for an aggregate purchase price of $1,000,000 in cash. Cerami Consulting plans to liquidate AVT and transfer the assets and liabilities of AVT to a new company to be formed by Cerami Consulting or its designee ("NewCo").

2. Contemporaneously with the closing of the Transaction, Immuno will enter into agreements with NewCo pursuant to which Immuno and its successors will transfer to NewCo any and all notes, memoranda, scientific findings and electronic media in any way documenting or relating to the formation, development and improvement of the Virtual Lymph Node Technology (as defined below) in the possession of Immuno, its successors, its employees or its affiliates. Immuno will enter into such non-terminable consulting and cooperation agreements as NewCo shall reasonably request, *provided that*, Immuno shall not be required to incur any additional expense or obligation

51

in connection with any such agreements (collectively, the "Technology Transfer Agreements"). In consideration for such agreements, NewCo will grant to Immuno:

a. a royalty of 1.5% on the net sales of all Virtual Lymph Node products ("products" shall mean any Virtual Lymph Node product which such product shall include any product that combines multiple technologies into a single marketable product that cannot function without the benefit of the Virtual Lymph Node technology (e.g., a combination of a vaccine and the Virtual Lymph Node)) made by Newco and 8.5% of the net proceeds received from all any [sic] license, sublicensee, or joint venture for the Virtual Lymph Node or its products (the "Virtual Lymph Node" means the right, title and interest in the Patent Application filed March 2, 1998, Serial No. 09/033402 and any continuations, continuations in part, divisions, subdivisions and any patents issued pursuant thereto (the "Patent Application")) (together, the "Royalty"); provided, however, that licensing fees received from third parties will not count as proceeds received from sales of Virtual Lymph Node products.

b. In each year, commencing on the first anniversary of the closing date, NewCo will pay to Immuno (or its successors and assigns) a minimum Royalty of $50,000 per year for each of the ten years following the closing date. To the extent that the cumulative amount of minimum payments exceed the total amount of royalties due under clause 2.a. from time to time, the excess shall be carried forward as a credit and applied to the extent that royalties in any individual year exceed the minimum Royalty for such year (such minimum payment would be deducted from any future Royalty payment, e.g. if in year one there were no Royalties then NewCo would pay the minimum Royalty amount to Immuno and then if in year two there were Royalty payments owing to Immuno of $100,000, the first years' [sic] minimum Royalty payment would be credited against such amount and the balance of $50,000 would be paid to Immuno.).

c. Immuno shall obtain a world-wide, non-exclusive right to license the Patent Application for free in the event, and only in the event, that NewCo fails to make its minimum royalty payments after the second anniversary of the closing date of the Transactions.

52

3. Immuno understands and acknowledges that the Transaction is subject to and conditioned upon Cerami Consulting obtaining financing at terms with a tax consequences [sic] acceptable to Cerami Consulting in its sole discretion on or before April 1, 1999 (the "Financing"); provided, however, that the date shall be extended to May 1, 1999 if, on or prior to April 1, 1999, Cerami Consulting (or its financing party) states in writing to you that a closing is scheduled prior to June 1, 1999 with a credit worthy person to invest not less than $1,000,000 in Cermi [sic] Consulting, AVT or Newco. Cerami Consulting will not obtain the Financing from Coulter Pharmaceutical Corporation. Each party shall agree to use best efforts to minimize the tax costs of the transaction and close the transaction prior to June 1, 1999. Cerami Consulting shall promptly notify Immuno in the event that Cermai [sic] Consulting is not able to obtain financing. In the event that Cerami Consulting is unable to obtain the Financing on or before April 1, 1999, then the parties to this letter agree to divide each area of use as provided in this letter.

4. The parties expect that the following documents will be prepared, negotiated and executed in connection with the acquisition of the shares.

   a. a standard stock purchase agreement from Cerami Consulting to acquire the shares of AVT owned by Immuno, including, but not limited to:

   b. a mechanism for Cerami Consulting to acquire all shares of AVT held by Immuno;

   c. standard representations and warranties from Immuno and its affiliates including, organization and capitalization, authorization of transactions, non-contravention, subsidiaries, financial statements, absence of undisclosed liabilities, litigation, title to assets, legal compliance, intellectual property and brokers;

   d. representations from Cerami Consulting and NewCo including, organization, authorization of transaction, financing, no restriction against purchase of stock and brokers;

   e. conditions to closing including, payment of purchase price, consents, absence of litigation, resolution of the matters concerning Amnon Gonenne

53

including any restraining orders, representations being true and correct, governmental filings, due diligence and release of liens (if any);

f. legal opinion from this law firm to Immuno stating that Newco (or Cerami Consulting depending on the structure) is duly organized, duly authorized to enter into the transaction agreements, and that such contracts are enforceable against Newco (or Cerami Consulting, as the case may be). Such opinion shall contain assumptions and exceptions typical of other opinions delivered by this law firm in similar situations; and

g. as a condition to closing a legal opinion from Immuno's outside counsel in form and content satisfactory to Cerami Consulting regarding the legality and enforceability of the Transaction under New York and Delaware law.

5. The parties expect that a document with the following provisions will be prepared, negotiated and executed in connection with the Technology Transfer Agreements:

a. transfer of the notes and technical information concerning the Virtual Lymph Node to NewCo;

b. consulting services to be provided by Immuno, its successors, its employees, including Cohava Gelber, and other scientists as reasonably requested by NewCo;

c. payment of the Royalty and the minimum Royalty amounts by NewCo to Immuno or its successors and assigns;

d. mutual non solicit and confidentiality from Immuno and Cerami Consulting or NewCo and their key employees and an agreement to keep confidential techniques used which involve the Virtual Lymph Node for discovering new antigens and antibodies, including an agreement not share with third parties any techniques developed exclusively by Immuno for such discovery;

e. a non-compete agreement and such non-solicit agreements from each of Len Gordon, David Dove and Cohava Gelber for a period of 2 and one half years following the closing date (such agreement will permit Immuno to

54

discover antigens and antibodies as provided below). Such non-compete shall be in addition to, and no way limit [sic] (even after expiration of such non-compete agreements) NewCo's right of ownership, including the right to modify, the Patent Application and future patent thereof.

6. As of the date hereof, Cerami Consulting and Immuno shall have the co-exclusive, world wide right to use the Virtual Lymph Node for the discovery of antigens and antibodies using non human animals (the "Discovery Products"). In the event the Transaction is consummated, NewCo shall grant Immuno a world-wide, non exclusive (as opposed to co-exclusive), non transferable, license to use the Virtual Lymph Node for the discovery Discovery Products [sic]. NewCo shall receive a royalty of 1% on the net sales of all Discovery Products and 5.0% of the net proceeds received from all third party licenses; provided, however, that licensing fees received from third parties will not count as proceeds received from sales of Discovery Products. No minimum royalty would apply.

7. Cerami Consulting and Immuno agree to split the use of the Virtual Lymph Node technology in humans in the event, and *only* in the event, Cerami Consulting or its affiliate does not purchase the AVT shares from Immuno as provided in this letter, unless such failure to purchase is caused by Immuno's refusal to comply with the provisions of this letter, in the following manner:

   a. The parties will alternate choosing from the following list until each has chosen three areas. Immuno shall choose first. The areas are 1. Infectious disease; 2. Cancer; 3. Autoimmune disease; 4. Allergy; 5. Solid Organ Transplant; 6. Bone Marrow Transplant; 7. Cardiovascular disease; and 8. Metabolic Disease.

   b. Each party will give the other party a non competition agreement with respect to the other party's choices.

   c. Each party is free to develop and compete in any areas other than the three exclusive areas of the other.

   d. The royalty split shall provide reasonable protection to each party to ensure that license fees are being accounted for accurately.

Very truly yours,

CERAMI CONSULTING CORPORATION

By: _____
        Anthony Cerami
        President


Accepted and agreed to as of this 9th day of April, 1999:

IMMUNOTHERAPY, INC.

By:        /s/ C. Leonard Gordon
Name:    C. Leonard Gordon
Title:     Chairman