20-3632-cv
*Murphy v. Inst. of Int'l Educ.*

# United States Court of Appeals
# For the Second Circuit

August Term 2021

Argued:  December 8, 2021
Decided: April 26, 2022

No. 20-3632-cv

PHILANA MURPHY,

*Plaintiff-Appellant*,

*v.*

INSTITUTE OF INTERNATIONAL EDUCATION,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of New York
No. 19-cv-1528, Andrew L. Carter, *Judge*.

Before:     CARNEY, SULLIVAN, and MENASHI *Circuit Judges*.

Plaintiff Philana Murphy, proceeding pro se, sued her employer, the Institute of International Education, for discrimination in violation of federal, state, and local, employment law.  The district court (Carter, *J.*) referred the matter to the Southern District of New York's mediation program and appointed pro bono counsel for Murphy.  At the conclusion of the mediation, the parties reached

an agreement to settle the case. The parties committed that agreement to writing, signed it, had their counsel sign it, and had the mediator sign it. In addition to setting forth the material terms of the settlement, the mediation agreement stated that a more formal settlement agreement would follow. The week after the mediation, Murphy contacted the district court seeking to revoke her acceptance of the mediation agreement and to continue the litigation. The Institute then moved to enforce the mediation agreement. The district court, over Murphy's objection, enforced the mediation agreement and entered judgment in favor of the Institute.

On appeal, we must decide whether the mediation agreement was a preliminary agreement that bound the parties to its terms or merely an agreement to continue negotiating in good faith. Based on the text of the mediation agreement and its context, we conclude that the mediation agreement bound the parties to its terms. We also reject Murphy's alternative argument that the agreement was voidable because she signed it under duress. We therefore AFFIRM the judgment of the district court.

AFFIRMED

> G. OLIVER KOPPELL (Daniel F. Schreck, *on the brief*), Law Offices of G. Oliver Koppell & Associates, New York, NY, *for Plaintiff-Appellant*.
>
> DANIEL J. LAROSE (John P. Keil, *on the brief*), Collazo & Keil LLP, New York, NY, *for Defendant-Appellee*.

RICHARD J. SULLIVAN, *Circuit Judge*:

Plaintiff-Appellant Philana Murphy appeals a judgment of the district court (Carter, *J.*) enforcing the settlement agreement Murphy entered into with Defendant-Appellee the Institute of International Education (the "Institute") following a mediation in the district court's mediation program. On appeal,

2

Murphy argues that the mediation agreement is not a preliminary agreement that binds her to its terms. Because we hold that the terms of mediation agreements like this one are enforceable and that Murphy did not enter into the agreement under duress, we affirm the judgment of the district court.

## I. BACKGROUND

In February 2019, Murphy, proceeding pro se, filed a complaint against her employer, the Institute, alleging unlawful employment discrimination in violation of federal, state, and local, employment law. Shortly thereafter, the district court referred the case to the Southern District of New York's mediation program and appointed pro bono counsel to represent Murphy in that mediation.

At the conclusion of the mediation, the parties advised the mediator that they had settled the dispute, and the parties executed a document that included the case caption and was titled "Mediation Agreement." The body of the agreement begins with a pre-printed sentence: "IT IS HEREBY AGREED by and between the parties and/or their respective counsel that, following mediation, agreement has been reached on all issues." App'x at 42. Below that sentence, the parties hand-wrote:

> In exchange for a discontinuance with prejudice of the instant action and a general release for all claims that

3

have been brought or could have been brought by Plaintiff against Defendant (and any employees, agents or entities thereof), Defendant will furnish to Plaintiff:
>   (1) One year's worth of salary as of 8/16/19
>   (2) Two months['] worth of COBRA premium contributions; and
>   (3) Regular pay and benefit[s] until August 23, 2019.
> A full settlement agreement w/ applicable releases will follow.

*Id.* The parties and their attorneys signed the mediation agreement, as did the mediator. In light of the agreement, the district court entered an order dismissing the case the following week.

Following the mediation, Murphy's counsel and the Institute's counsel negotiated a more comprehensive settlement agreement. The full agreement included several additional provisions, including the Institute's disclaimer of any liability; Murphy's agreement not to seek employment with the Institute or any of its affiliates; Murphy's obligation to maintain confidentiality of the agreement's terms, her acknowledgment that confidentiality "is a material term of the Agreement," and her agreement to return 20% of the settlement amount if she were to violate the confidentiality provision; Murphy's commitment not to disparage the Institute or its affiliates; the Institute's agreement to provide a neutral reference; and Murphy's agreement not to assist anyone else in pressing

4

claims against the Institute or its affiliates. App'x at 45–55. The full agreement also contains a number of general provisions addressing matters such as contract integration and interpretation.

Three days after signing the mediation agreement, Murphy called the district court and expressed a desire to revoke the mediation agreement. Murphy was told to send an email to the court, which she did three days later. In that email, Murphy said that she was nervous and confused during the mediation and that she told her attorney that she was not comfortable signing the mediation agreement. She also said that she called her mother, and her mother told her not to sign the mediation agreement. Murphy wrote that her attorney advised her that mediation "was the nicer portion of [her] lawsuit" and that the mediator told her that if she continued, she "would be stuck in a room filled with white men that would question every aspect of [her] life for hours," the thought of which Murphy found intimidating. App'x at 44. Murphy said that she then took ten minutes outside the room to clear her head and that when she came back, she asked if she could have until Monday to think over the mediation agreement. According to Murphy, she was told no and that the mediation agreement included the most compensation she would ever receive. Ultimately, Murphy said, she signed the

mediation agreement because she "was so sad and felt [she] had no choice but to sign." *Id.*

After Murphy refused to sign the full agreement, the Institute filed a motion to enforce the mediation agreement, which the district court referred to Magistrate Judge Cave for Report and Recommendation. Over Murphy's objections, the district court eventually adopted the Report and Recommendation to enforce the mediation agreement, and entered a judgment in favor of the Institute. Murphy timely appealed.

## II.   DISCUSSION

We review the district court's findings of fact for clear error and its conclusions of law de novo. *Ciaramella v. Reader's Dig. Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997). "It is well established that settlement agreements are contracts and must therefore be construed according to general principles of contract law." *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (internal quotation marks omitted). Whether a binding agreement exists is a question of law. *See Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008).

### A.   The Mediation Agreement Bound the Parties to its Terms

In *Teachers Insurance and Annuity Association of America v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987), Judge Leval – then on the district court – described two

6

kinds of preliminary contracts that are recognized under New York law. The first (Type I) "occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation." *Id.* at 498. This kind of agreement is preliminary "only in the sense that the parties desire a more elaborate formalization of the agreement," which, although not necessary, is desirable. *Id.* The second (Type II) "is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." *Id.* In the second type of preliminary agreement, the parties "bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." *Id.* While a party cannot demand performance under a Type II agreement, a party may demand "that his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms." *Id.* We subsequently adopted this framework for analyzing preliminary agreements in *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71–73 (2d Cir. 1989), and we continue to apply this framework today, *see Vacold*, 545 F.3d at 124–29.

7

Previously, we have referred to the four factors articulated in *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80–81 (2d Cir. 1985), when determining whether something constitutes a Type I agreement. *See Adjustrite Sys., Inc. v. GAB Business Servs., Inc.*, 145 F.3d 543, 549 (2d Cir. 1998). And we have referred to a modified five-factor version of that test when considering whether something is a Type II agreement. *See Arcadian*, 884 F.2d at 72. But while we have said that "these factors help us identify categories of facts that are often useful in resolving disputes of this sort," we have made it clear that "they do not provide us with a talismanic scorecard." *Vacold*, 545 F.3d at 125. Indeed, from the start we have acknowledged that some of these factors may be disregarded when not relevant or helpful to our analysis. *See Arcadian*, 884 F.2d at 72 ("In applying the *Tribune* test to this case, we need look no further than the first factor."); *see also Vacold*, 545 F.3d at 124–25. In other words, while these factors may be helpful, "the ultimate issue, as always, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." *Vacold*, 545 F.3d at 125 (internal quotation marks omitted). For that reason, while the "existence of open terms 'is always a factor tending against the conclusion that the parties have reached a binding agreement,' … if the parties intended to be bound despite the presence of open terms, 'courts

8

should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations.'" *Id*. at 128 (quoting *Tribune*, 670 F. Supp. at 499).

Here, we are confronted with a written agreement that has been executed. Unlike in *Winston*, where the key issue was "whether the parties intended to be bound," *Winston*, 777 F.2d at 80, the question instead is what kind of agreement did the parties make. While we have a body of law distinguishing non-binding agreements from Type I agreements and non-binding agreements from Type II agreements, we have had fewer occasions to explain how courts should distinguish between Type I and Type II agreements when confronted with an agreement that is clearly binding in some sense.

In differentiating between Type I and Type II agreements, we are mindful of the twin concerns Judge Leval articulated in *Tribune.* On the one hand, courts ought "to avoid trapping parties in surprise contractual obligations." *Tribune*, 670 F. Supp. at 497. On the other hand, "it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation." *Id.* at 498. While "[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals[,] and expressly anticipate future preparation

9

and execution of contract documents," *Arcadian*, 884 F.2d at 73 (quoting *Tribune*, 670 F. Supp. at 499), that presumption can be overcome and "courts should not frustrate [parties] achieving [their] objective[s] or disappoint legitimately bargained contract expectations," *Vacold* 545 F.3d at 128 (quoting *Tribune*, 670 F. Supp. at 499).

We start with the text of the agreement, which is the most important consideration when determining how the parties intended to be bound. *See id.* at 125; *Brown*, 420 F.3d at 154; *Arcadian*, 884 F.2d at 72. The mediation agreement clearly states that "agreement has been reached on all issues," which is strong language indicating this is a Type I agreement. App'x at 42. This is not a case in which the language of the agreement merely committed the parties to "work together in accordance with the terms and conditions outlined in" the agreement, which would be a Type II agreement to continue negotiating. *Brown*, 420 F.3d at 158 (internal quotation marks omitted). And while this language was pre-printed, the parties could have crossed it out if they did not intend to acknowledge that agreement on all issues had been reached or they could have added language in the handwritten portion of the mediation agreement reserving the right not to be bound by the mediation agreement's terms until the final agreement was drafted

and signed. *See Tribune*, 670 F. Supp. at 499. For example, the memorandum in *Arcadian* was not a Type I agreement because it explicitly referenced the possibility that the negotiations would fail and stated that a binding agreement would be completed at a future date. *See Arcadian* 884 F.2d at 72; *see also Adjustrite*, 145 F.3d at 550 (holding that an agreement was not a Type I agreement because it was "expressly contingent" on the execution of future contracts). Here, the language of the mediation agreement is unequivocal and so strongly indicates that this is a Type I agreement.

Similarly, the language of the mediation agreement reflects that the terms included in the agreement were the material terms. Although the mediation agreement clearly contemplates a final contract that "would include additional boilerplate," that does not prevent us from finding a Type I agreement so long as the parties "foresaw no disputes relating to the boilerplate." *Vacold*, 545 F.3d at 129 (internal quotation marks omitted). A Type I agreement, by definition, contemplates a future formalization that will likely include some additional terms. *See Tribune*, 670 F. Supp. at 498. But as long as "there were no issues outstanding that were perceived by the parties as requiring negotiation," trivial open issues will not prevent the court from upholding a Type I agreement. *Shann v. Dunk*, 84

11

F.3d 73, 82 (2d Cir. 1996). In point of fact, parties can choose to be bound "despite the presence of open terms." *Vacold*, 545 F.3d at 128. Here, Murphy received one year's worth of salary, two months' worth of COBRA premium contributions, and regular pay and benefits until August 23, 2019 "[i]n exchange" for settling her suit. App'x at 42. Both the language of the mediation agreement and the record indicate that these were the material terms that the parties needed to negotiate in the mediation. *See Vacold*, 545 F.3d at 128–29.

To be sure, the full agreement contained terms that were not in the mediation agreement, including a confidentiality provision identified as material. But there is no evidence – either in the text of the mediation agreement or the record – to suggest that those new terms were considered open issues in need of negotiation at the time the parties entered into the mediation agreement, which is the proper frame of reference. And a party cannot reopen a deal by proposing additional terms at a later date. Of course, Murphy cannot be bound by those additional terms because she never agreed to them. But she can be bound by the mediation agreement, which on its face is a paradigmatic Type I agreement,

12

binding with respect to its terms despite contemplating a later formalization. *See Tribune*, 670 F. Supp. at 498.

The context of the district court's mediation program further confirms that this was a Type I agreement. *See Vacold*, 545 F.3d at 127–28 (looking to the context of the negotiations). It is clear that everyone in the mediation understood the executed mediation agreement to bind the parties to its terms and not merely to set a framework for future negotiations. The parties and their attorneys signed the mediation agreement, as did the mediator. By her own admission, Murphy agonized over the mediation agreement, taking time to clear her head and to call her mother before signing it, indicating that she thought the mediation agreement would bind her and conclude the litigation. There is nothing in the record to suggest that Murphy or anyone else construed the mediation agreement to be just an invitation to further negotiation.

In sum, there can be no doubt that the parties here "intend[ed] to be bound" by the mediation agreement, *id.* at 125, and the fact that they may have anticipated "lawyers' embellishments" in a final formal agreement, *Shann*, 84 F.3d at 78, in no way makes the mediation agreement unenforceable. To hold otherwise would defeat the very purpose of the mediation program and render the execution of

13

mediation agreements a hollow and pointless exercise. In all but the most unusual circumstances, mediation agreements that include express language indicating that the parties have reached agreement on all material terms are presumptively Type I agreements – unless the parties explicitly reserve the right not to be bound by the mediation agreement's terms until a final agreement is drafted and signed.

**B.** **Murphy Was Not Under Duress When She Signed the Mediation Agreement**

As a secondary argument, Murphy contends that, due to the pressure placed on her by the mediator and her attorney, the mediation agreement is voidable because she signed it under duress. "In general, repudiation of an agreement on the ground that it was procured by duress requires a showing of both a wrongful threat and the effect of precluding the exercise of free will." *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 88 (2d Cir. 2011) (internal quotation marks and alterations omitted). There is no evidence to support the contention that Murphy's free will was overcome. To the contrary, Murphy was given the opportunity to step outside of the room and collect herself, and she was given the opportunity to call her mother to discuss her options. While her attorney and the mediator urged her to sign the mediation agreement, no one prevented her from leaving the mediation or continuing with the litigation. Moreover, we agree with

14

other courts to address this issue and the Restatement that a party seeking to void an agreement based on duress must show that the alleged coercive behavior originated with the defendant or was known to the defendant at the time the agreement was made. *See Evans v. Waldorf-Astoria Corp.*, 827 F. Supp. 911, 914 (E.D.N.Y. 1993), *aff'd*, 33 F.3d 49 (2d Cir. 1994); *see also* Restatement (Second) of Contracts § 175 (Am. Law Inst. 1981). In her declaration and in her email to the district court, Murphy does not describe any coercive behavior by the Institute during the mediation nor does she assert that the Institute knew of any coercive behavior at the time she and the Institute agreed to settle the case. Insofar as Murphy was put under any pressure to sign the mediation agreement, that pressure came from her counsel and the mediator, not the Institute or its attorneys. Accordingly, we reject Murphy's argument that the mediation agreement is void because she signed it under duress.

## III.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.