*Lekuntwane v. Help at Home CT, LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 17th day of September, two thousand twenty-five.

PRESENT:

> PIERRE N. LEVAL,
> RICHARD C. WESLEY,
> RICHARD J. SULLIVAN,
> *Circuit Judges*.

_____

KEFILWE LEKUNTWANE, and all others similarly situated,

> *Plaintiff-Appellee*,

v.                                                                            No. 24-1662

HELP AT HOME CT, LLC, ALZHEIMER'S AND DEMENTIA CARE, LLC, HOMECARE

CONNECTIONS, LLC, MARY ANN
CIAMBRIELLO,

*Defendants-Appellants*.

_____

| | |
|---|---|
| **For Defendants-Appellants:** | PETER J. MURPHY, Shipman & Goodwin LLP, Hartford, CT. |
| **For Plaintiff-Appellee:** | THOMAS J. DURKIN (Richard E. Hayber, *on the brief*) Hayber, McKenna & Dinsmore, LLC, Hartford, CT. |
| | Nitor V. Egbarin, Law Office of Nitor V. Egbarin, LLC, Hartford, CT. |

Appeal from a judgment of the United States District Court for the District of Connecticut (Robert N. Chatigny, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that this appeal is **REMANDED** for further findings consistent with this order.

Help at Home CT, LLC, Alzheimer's and Dementia Care, LLC, Homecare Connections, LLC, and Mary Ann Ciambriello (together, the "Defendants") appeal from a judgment of the district court enforcing a settlement agreement entered into by Defendants and Kefilwe Lekuntwane, a former live-in health aide who had brought a putative class- and collective-action complaint for alleged violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq.* (the "FLSA"), and Connecticut

Minimum Wage Act, Conn. Gen. Stat. § 31-68 *et seq.* (the "CMWA"). We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

We review the district court's findings of fact for clear error and legal conclusions *de novo*. *See Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005). Under Connecticut law, which the parties agree governs the settlement agreement and this appeal, "a contract is binding if the parties mutually assent[ed] to its terms." *Id.* at 444. In the settlement context, the agreement need not be signed, and it need not even be reduced to writing. *See id.* A court may summarily enforce a settlement agreement so long as "the terms of the agreement are clear and unambiguous" and "the parties do not dispute the terms of the agreement." *Audubon Parking Assocs. Ltd. v. Barclay & Stubbs, Inc.*, 225 Conn. 804, 811–12 (1993). Nevertheless, a settlement agreement may not be enforced if, "in the contemplation of the parties, something remains to be done to establish the contractual relation." *Klein v. Chatfield*, 166 Conn. 76, 80 (1974).

Defendants argue that the district court erred in finding the parties had entered into an enforceable settlement in the form of a Memorandum of Understanding (the "MOU") that was later supplemented by a draft agreement.

3

Although the MOU – reached after a mediation with Magistrate Judge Joan G. Margolis – reflects that the parties agreed to the total settlement amount and a general payment structure, the MOU expressly left a number of issues open and unresolved, including (1) the finalizing of a class list; (2) the particulars of the payment process from Defendants' payroll company; (3) what to do in the event of an uncashed settlement check; (4) the formulation of release language to be included on the checks; (5) whether to provide pay-early incentives; (6) whether to impose late-payment penalties; (7) who would be responsible for the payment of taxes; and (8) whether to include Medicare waivers.

After the six-hour session with Judge Margolis, counsel for Defendants confirmed by email that "[w]e have agreed on the gross amount of the settlement ($1,340,000) and the general structure of the payments," but noted that "there are several details that need to be worked out to finalize the resolution of this matter"; to that end, counsel "attach[ed] a revised draft of the MOU . . . highlighting areas we feel remain unresolved."   Defs. App'x at 206.   Without attempting to resolve the open items (or dispute Defendants' characterization of them as things that "need[ed] to be worked out to finalize the resolution of this matter"), Plaintiff's

4

counsel responded with a short email indicating "[t]his is fine" and "[w]e have a deal." *Id.* at 205.

The parties later agreed on a deadline to file a joint motion for preliminary approval of a settlement, but the settlement eventually fell apart. In particular, the parties exchanged drafts of a final settlement agreement and, on the eve of the filing deadline, defense counsel sent a version that Lekuntwane, but not Defendants, signed. Shortly after moving to extend the deadline, counsel for Defendants moved to withdraw, citing a "breakdown in communication" between client and counsel that "render[ed] on-going representation unworkable." *Id.* at 8 (internal quotation marks omitted). A few months later, Lekuntwane moved to enforce the MOU, attaching the MOU and the half-signed agreement as exhibits.

In evaluating whether parties to a settlement agreement intended to be bound absent an executed writing, we have endorsed three factors set forth by the Connecticut Supreme Court in *Klein*: "(1) [the] language used, (2) circumstances surrounding the transaction, including the motives of the parties, and (3) purposes which they sought to accomplish." *See Omega Eng'g, Inc.*, 432 F.3d at 444 (internal quotation marks omitted). These factors "are similar, though not identical, to the factors" relied upon by New York courts. *See id.* Applying New York law, we

5

have explained that the principal objective is to determine whether an agreement coming out of a mediation is either "complete . . . on all the issues perceived to require negotiation," or instead is "one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." *Murphy v. Inst. of Int'l Educ.*, 32 F.4th 146, 150–51 (2d Cir. 2022) (internal quotation marks omitted). The former is referred to as a "Type I" agreement and would be binding under New York law. *See id.* at 150. The latter is known as a "Type II" agreement and only binds the parties to negotiate in good faith toward a final agreement. *See id.* at 150–51. Though Connecticut courts have not adopted the Type I/Type II framework as such, the central question under both Connecticut and New York law is, of course, whether and to what extent the parties to a preliminary settlement agreement intended to be bound. *See Omega Eng'g, Inc.*, 432 F.3d at 444.

Interestingly, the district court pointed out that "neither side discusses whether the Connecticut Supreme Court likely would or would not apply th[e] [Type I/Type II] framework." Sp. App'x at 5. Nonetheless, the district court concluded that "Defendants' counsel and Plaintiffs' counsel were together acting in the very way that the Second Circuit's framework contemplates when you have

6

what the Second Circuit refers to as a Type II agreement." *Id.* at 8. It then found the settlement agreement was binding even though, as mentioned above, a Type II agreement merely obligates the parties to negotiate toward a final agreement in good faith. *See Murphy*, 32 F.4th at 150–51.

On this record, we cannot be satisfied that the parties intended the MOU to be "regard[ed]" as a "completed" agreement under *Klein*. 166 Conn. at 80. The district court's inquiry focused on whether either party expressed that any of the eight open items in the MOU "were essential to an enforceable agreement." *Wittman v. Intense Movers, Inc.*, 202 Conn. App. 87, 99 (2021) (internal quotation marks omitted); *see also Santos v. Massad-Zion Motor Sales Co.*, 160 Conn. App. 12, 19 (2015) (describing how "Connecticut cases require definite agreement on the essential terms of an enforceable agreement" (internal quotation marks omitted)). But there is an absence of evidence to support a finding that these eight terms were immaterial. Though the district court found "none of the [eight] items . . . rendered the MOU unenforceable," it did not make any specific findings related to these items. Sp. App'x at 18. The district court's evidentiary hearing lasted for a total of 40 minutes, involved no witness testimony, and turned primarily on email exchanges between counsel.

7

But even taken at face value, the emails reflect that the eight open items precluded the formation of a binding settlement. Defendants considered there to be "several details *that need to be worked out* [in the MOU] to finalize the resolution of this matter." Defs. App'x at 206 (emphasis added). Indeed, in the following months, the parties reached an impasse related to the class list that prevented the filing of settlement papers. *See id.* at 377 ("The list was always a work in progress. We are still working that out."); *see also id.* at 382 (explaining that, because of an "obvious disconnect" and "lack of agreement" on the class list, there is "no way we can finalize the agreement before the end of the day tomorrow"). Lekuntwane's own lawyer represented that "if the settlement papers are not filed by [the deadline]," "then Defendants would have breached the settlement MOU and the settlement agreement will be *null and void*." *Id.* at 383 (emphasis added). Accordingly, record evidence suggests that the eight open items *were* material and that the MOU was intended to be a preliminary step in negotiations – not a binding agreement to settle the case.

For similar reasons, we cannot say that "any such alleged defect [with the MOU] was cured through the parties' subsequent communications with each other and Magistrate Judge Margolis." Sp. App'x at 19. Though the parties later

8

attempted to draft a more comprehensive agreement, there is no evidence that Defendants, who never signed the agreement, intended to be bound by it before its execution. The district court did not adequately explain how drafting and sending the *unsigned* settlement agreement manifested Defendants' intent to be bound. Indeed, defense counsel's assertion that the agreement still "has to go to our client" and "we are not [ready to file]," Defs. App'x at 223, coupled with the agreement itself which provides that it only "shall be binding upon the party whose counsel transmits the signature page by facsimile or email," *id.* at 249, suggests that "the parties [did not] intend . . . to be bound until they . . . executed a formal document embodying their agreement," *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir. 1968); *see also Klein*, 166 Conn. at 80 (explaining that a settlement agreement may not be enforced "so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation").

To be sure, in *Wittman*, the Connecticut Appellate Court found that a subsequent agreement "cured" possible defects with an MOU. *See Wittman*, 202 Conn. App. at 101. But that was only after the court had determined that the MOU in question (which the parties had actually signed) "facially . . . set[] forth the material terms," and the defendants "conceded . . . that the final settlement

9

agreement presented to them for execution set forth the parties' entire agreement,"

save for one disputed term that the court found was immaterial. *Id.* (alteration

accepted and internal quotation marks omitted); *see also id.* at 95 (describing the

court's finding that the defendant "never made known to the plaintiff[s] . . . that

the [settlement] agreement was contingent upon him getting financing" (internal

quotation marks omitted)). Because the parties' MOU is unexecuted and

highlights several open items, and because Defendants do not concede that the

draft agreement was simply meant to "fill[] in the blanks," *id.* (internal quotation

marks omitted), this case appears to be more like *Santos*, in which "incomplete

essential term[s]" prevented the creation of any binding agreement, 160 Conn.

App. at 21.

Accordingly, "[i]n the interests of judicial economy and orderly resolution

of this matter," *Florez v. CIA*, 829 F.3d 178, 189 (2d Cir. 2016), we find it appropriate

to remand the case pursuant to our practice under *United Staes v. Jacobson*, 15 F.3d

19 (2d Cir. 1994), so that the district court may undertake a renewed factual inquiry

to determine whether the parties intended to be bound under *Klein* by the MOU

as supplemented by any subsequent agreement or the final settlement agreement itself.[1]

<p style="text-align:center">*    *    *</p>

For the reasons discussed above, we **REMAND** for further proceedings consistent with this order pursuant to *Jacobson*. After the district court "conduct[s] . . . further fact-finding" and "reconsider[s] its prior conclusion," the parties may "then return its determination to [this panel] for consideration without the need for a new notice of appeal, briefing schedule, and reassignment to a new panel unfamiliar with the case." *Florez*, 829 F.3d at 189. Within thirty

---

[1] Defendants also argue that the purported agreement, concerning the settlement of claims for violations of the FLSA on behalf of a collective, would not be enforceable until approved by the district court under *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015). But *Cheeks*, which held that a plaintiff must obtain court approval under Federal Rule of Civil Procedure 41(a)(1)(A)(ii) before dismissing claims with prejudice, would not itself prevent the district court from enforcing the parties' agreement as a matter of contract law. Whether the parties intended that the settlement agreement be contingent on *Cheeks* approval is a separate factual question that the district court may consider on remand. *See Chang v. TK Tours, Inc.*, 605 F. Supp. 3d 529, 540 (S.D.N.Y. 2022) (considering the necessity of *Cheeks* approval under the factors set forth in *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir. 1985)); *Williams v. Playscripts, Inc.*, No. 22-cv-6861 (AMD) (SJB), 2024 WL 3823198, at *7 (E.D.N.Y. Aug. 13, 2024) (same).

<p style="text-align:center">11</p>

days of the conclusion of the proceedings, either party may restore the matter to

the active docket of this Court by letter and propose a schedule for supplemental

briefing.

<div style="margin-left: 45%;">
FOR THE COURT:<br>
Catherine O'Hagan Wolfe, Clerk of Court
</div>