24-2840 (L)
*Javelin Global Commodities (UK) Ltd. v. Lexington Coal Company, LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 1st day of May, two thousand twenty-six.

Present:
> DEBRA ANN LIVINGSTON,
> *Chief Judge*,
> BARRINGTON D. PARKER,
> MYRNA PÉREZ,
> *Circuit Judges*.

_____

JAVELIN GLOBAL COMMODITIES (UK) LTD.,
BLUEGRASS COMMODITIES, LP, FORMERLY KNOWN
AS BLACKJEWEL MARKETING AND SALES, LLC,

> *Plaintiffs-Counter-Defendants-Appellees*,

v.                                                        24-2840 (Lead),
                                                          24-3065 (Con)

LEXINGTON COAL COMPANY, LLC,

> *Defendant-Counter-Claimant-Appellant*.

_____

| | |
|---|---|
| For Plaintiffs-Counter-Defendants-Appellees: | JOSHUA I. HAMMACK (Robert R. Bell III, *on the brief*), Bailey & Glasser, LLP, Washington, D.C. |
| For Defendant-Counter-Claimant-Appellant: | JEFFREY T. CRISWELL, Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA. |

Appeal from a judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Defendant-Counter-Claimant-Appellant Lexington Coal Company, LLC ("Lexington") appeals from a September 23, 2024 summary judgment order, an October 15, 2024 Order Resolving Issues in Dispute, and a November 5, 2024 final judgment of the District Court for the Southern District of New York (Hellerstein, *J.*), granting summary judgment to Plaintiffs-Counter-Defendants-Appellees Javelin Global Commodities (UK) Ltd. ("Javelin") and Bluegrass Commodities, LP ("Bluegrass" or, with Javelin, "Plaintiffs"). This case arises out of Lexington's alleged breach of an exclusive marketing agreement, two metallurgical coal sales confirmations, and three thermal coal sales confirmations. The parties signed a Term Sheet that set forth settlement terms and later exchanged emails pertaining to the Term Sheet. The district court held: (1) that Javelin, Bluegrass, and Lexington entered a binding Type I agreement as to the delivery of thermal coal; (2) that the parties' June 2022 email exchange constituted a binding modification of the Term Sheet's terms regarding the sale of metallurgical coal; and (3) that the parties entered into a binding agreement to release claims relating to the exclusive marketing agreement in exchange for cash consideration of $750,000. On November 5, 2024, the district court entered a final judgment in favor of Bluegrass against Lexington in the total amount of $18,663,546.36 and in favor of Javelin against Lexington in the total amount of $1,218,783.39.

We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

\* \* \*

2

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court "review[s] the district court's grant of summary judgment *de novo*, construing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Aponte v. Perez*, 75 F.4th 49, 55 (2d Cir. 2023) (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)).

**A. Vacillation**

Lexington first argues that the district court committed "clear error" by "vacillati[ng] over the Term Sheet's enforceability." Appellant's Br. at 18. Upon careful review of the record, we find this argument unavailing. Twice, the district court expressly stated that the Term Sheet is a binding agreement. To be sure, at an earlier stage in the litigation (and at Lexington's urging), the court vacated its initial grant of a motion to enforce the Term Sheet upon reconsideration. In reconsidering the enforceability of the Term Sheet, the district court concluded that contrary to its original decision, "material issues of fact as to the Parties' intent" remained. We discern no error, let alone clear error, in the district court revisiting that open factual issue after additional discovery.

**B. Law of the Case Doctrine**

Lexington next seeks to invoke the law of the case doctrine and contends that the district court violated the doctrine by failing to adhere to its prior ruling on the reconsideration motion. However, Lexington cannot invoke the doctrine because it applies "when a court decides upon a rule of law." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). In its order granting the motion for reconsideration, the district court did not decide on a rule of law, but rather decided that material issues of fact as to the parties' intent persisted.

3

Moreover, even assuming, *arguendo*, that the doctrine applied here, the "law of the case doctrine 'does not rigidly bind a court to its former decisions, but is only addressed to its good sense.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *Higgins v. Cal. Prune & Apricot Grower, Inc.*, 3 F.2d 896, 898 (2d Cir. 1924) (L. Hand, J.)). "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance[.]" *Christianson*, 486 U.S. at 817; *see* Fed. R. Civ. P. 54(b); *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 378 (2d Cir. 2024). District courts "may depart from the law of the case for cogent or compelling reasons including an intervening change in law, availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Johnson*, 564 F.3d at 99–100 (internal quotation marks omitted) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002)). Here, the district court relied on new evidence—the Lexington CEO and President's deposition testimony acknowledging that the Settlement Term Sheet, by incorporation of the terms of the original thermal coal confirmations constituted an agreement.

**C. Type I Agreement or Type II Agreement**

Lexington next disputes whether the Term Sheet and the June 2022 emails together constitute a Type I agreement. There are two types of preliminary contracts recognized under New York law: Type I and Type II agreements. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71–73 (2d Cir. 1989). "The first (Type I) 'occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation.'" *Murphy v. Inst. of Int'l Educ.*, 32 F.4th 146, 150 (2d Cir. 2022) (quoting *Tchrs. Ins. & Annuity Ass'n of Am. v. Trib. Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)). "This kind of agreement is preliminary 'only in the sense that the parties desire a more elaborate formalization of the agreement,' which, although not necessary, is desirable." *Id.* (quoting

4

*Tribune*, 670 F. Supp. at 498). "The second (Type II) 'is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated.'" *Id.* (quoting *Tribune*, 670 F. Supp. at 498). In a Type II agreement, "the parties 'bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement.'" *Id.* at 151 (quoting *Tribune*, 670 F. Supp. at 498).

In *Winston v. Mediafare Entertainment Corp.*, we articulated four factors to determine whether an agreement is a Type I agreement. 777 F.2d 78, 80 (2d Cir. 1985).

> The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Id.* To determine whether an agreement is a Type II agreement, we evaluate "whether the intent to be bound was revealed by (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Arcadian Phosphates, Inc.*, 884 F.2d at 72 (citing *Tribune*, 670 F. Supp. at 499–503). Although these factors may be helpful, "they do not provide us with a talismanic scorecard." *Vacold LLC v. Cerami*, 545 F.3d 114, 125 (2d Cir. 2008). "The ultimate issue, as always, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." *Id.* (internal quotation marks omitted).

Here, the Term Sheet, as modified by the June 2022 emails, constituted a Type I agreement. The language of the Term Sheet is express. It starts with "Lexington . . . and Javelin . . . and Bluegrass . . . agree to the following terms in connection with the claims asserted in the lawsuit[.]" App'x at 40. The Term Sheet further provides: "Exclusive Coal Marketing Agreement— Lexington and Javelin agree to settle all claims related to this agreement for the cash consideration of $750,000." *Id.* at 41. It proceeds to outline the parties' agreement to settle claims related to the confirmations from the Master Coal Purchase and Sale Agreement by delivering specified quantities of metallurgical coal at fixed prices at set times. Finally, the Term Sheet states that "Lexington will begin delivering trains of thermal coal to Javelin starting in April 2022" for the thermal coal sale confirmations. *Id.* at 40. The three coal sale confirmations "will be reissued as individual Purchase Orders incorporating the commercial terms of the original confirmations and the above delivery terms." *Id.* The Term Sheet sets forth all of the deal's material terms— the type of coal to be delivered, the prices to be paid for deliveries, and the applicable schedule. Lexington's argument that the Term Sheet lacks a provision detailing what happens in the event of default does not change the result. Even assuming the absence of such a term is material, Lexington acknowledges both that "there [was] default language in the original confirmations," *see* App'x at 284, and that beyond the schedule, the Term Sheet kept "all other terms . . . the same as originally agreed to" in the confirmations, *see* Appellant's Br. at 7. *See also* App'x at 230, 232 (June 2022 emails incorporating terms of the original purchase orders).

In a similar fashion, the June 2022 email exchange demonstrates that the parties agreed to a modification of the Term Sheet's metallurgical coal terms. "Under New York law, parties may modify a contract 'by another agreement[.]'" *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (quoting *CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc.*, 613 N.E.2d 159,

162 (N.Y. 1993)). On June 2, 2022, Javelin and Bluegrass offered to accept a one-million-dollar cash payment instead of the delivery of metallurgical coal provided for in the Term Sheet. Four days later, on June 6, 2022, Lexington agreed.

In all, the Term Sheet and June 2022 email exchange do not "speak in decidedly non-committal language suggesting, at most, a promise to work together." *Vacold*, 545 F.3d at 125 (internal quotation marks omitted). Instead, they set forth the material terms of the parties' settlement. Thus, we agree with the district court that the Term Sheet and June 2022 emails constitute a binding Type I agreement.

**D. Money Damages**

Lexington next argues that the district court erred in awarding damages in connection with Lexington's failure to deliver thermal coal to Bluegrass as opposed to ordering specific performance of the delivery. We again disagree. Lexington concedes that it did not deliver the thermal coal on the agreed-upon schedule in the Term Sheet. Pursuant to N.Y. U.C.C. § 2-713, Plaintiffs are entitled to money damages for Lexington's non-delivery.[1]

**E. Expert Evidence**

Lexington next maintains that the district court abused its discretion by adopting Plaintiffs' expert report to calculate the monetary damages related to the breach of the thermal coal sale confirmations. We again disagree. The district court set forth deadlines for expert reports and rebuttals and it also established a schedule for motions briefing. Lexington failed to rebut the

---

[1] N.Y. U.C.C. § 2-713 provides the damages calculation—"the measure of damages for non-delivery . . . by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (Section 2-715), but less expenses saved in consequence of the seller's breach."

expert report or timely raise any objection to it, despite ample opportunity to do so. In addition, we discern no error in the district court's determination that the unrebutted expert evidence was properly admissible. Accordingly, we conclude that the district court did not abuse its discretion in considering this evidence.

**F. Damages Inquest**

Finally, Lexington seeks remand for a damages inquest in connection with the determination of the monetary damages due to Javelin and Bluegrass for Lexington's breach of its obligation to deliver the thermal coal. We decline to remand for such an inquest. The district court conducted an appropriate "inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Secs. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999). It considered the expert's background—forty years of experience in coal marketing and production – and evaluated the basis of the expert's report, which was based on industry-standard publications and comparator data. Although the district court had the discretion to conduct additional proceedings, such as a damages inquest, had the court deemed it necessary and proper to do so, we cannot conclude that further inquiry was necessary in light of the evidence before the court.

* * *

We have considered Lexington's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

8